## ROBERT G. PENN v. THE STATE.

1. CRIMINAL PRACTICE. *Drawing of special venire. Pendency of another case.*
   It is not error for the circuit court to cause the drawing of a special venire in a capital case during the pendency of another case.

2. SAME. *Continuance. Supreme court practice. Case in judgment.*
   This court will not reverse a judgment of conviction of murder on the ground of the refusal of the court below to grant a continuance to the defendant because of the absence of three witnesses, when it appears that the facts which it was proposed to prove by one of them were inadmissible in evidence, that one was produced at the trial by the State, and said he knew nothing of the case, and that the other resided in an adjoining county, and might have been obtained by attachment and produced during the trial, and all the facts which it was proposed to prove by him were testified to by others.

3. SAME. *Application for continuance. Refusal to admit import of testimony.*
   The refusal of the court in such case to require the district attorney to admit that the absent witnesses would testify as set forth in the affidavit for continuance is not error.

4. Same. *Application for continuance after venire drawn.    Section 3059, Code 1880, applied.*

Under § 3059 of the Code of 1880, providing that no application for a continuance in a capital case shall be granted after the drawing of the special venire, "except for cause arising afterward, unless good cause be shown for not having made the application before," the court may refuse to entertain such application, after the drawing of the special venire, on the ground of the absence of any witness who had not been subpœnaed and made his appearance prior thereto, "unless for cause coming to the knowledge of the defendant after the drawing of the special venire."

5. Same. *Impaneling jury.   Conduct of examination.   Competency, when announced.*

In impaneling a jury in a capital case it is proper for the court to require the full examination of a juror touching his qualifications before passing upon his competency; and if the defendant's counsel, having the opportunity to do so, declines to propound any questions till after the court has pronounced a juror competent, he is not thereafter entitled to make any examination.

6. Same. *Competency of juror.   Effect of conversation with witness.*

The fact that a juror in a capital case has conversed with one of the State's witnesses concerning the case, does not render him incompetent to try the case, if he has no "fixed opinion" as to the guilt or innocence of the accused.   Code 1880, § 3072.

7. Murder. *Evidence,   Conversation between accused and witness previous to the killing.*

In the trial of an indictment for murder, the testimony of a witness with whom the defendant sought an interview on the night previous to the killing is admissible to show what was said in their conversation with reference to the relations existing between the deceased and the accused, even though such conversation embrace a narrative of a colloquy between the deceased and the witness which the witness repeated to the defendant, the latter not having been present when the colloquy took place between the witness and the deceased.

8. Same. *Evidence.   Declarations of deceased not made in presence of accused.*

It is improper in the trial of a charge of murder to admit evidence of the declarations of the deceased made on the night before the killing, and not in the presence of accused, to the effect that the accused was pursuing him and intended to kill him ; but if the truth of those declarations be abundantly shown by other and competent evidence, a judgment of conviction will not be reversed because of the error in admitting the evidence of such declarations.

9. MURDER. *Instructions. Repetition of principles of law.*

The circuit court, after having given for a defendant on trial for murder instructions covering every principle of law applicable to his defense, may properly refuse to reiterate such principles in further instructions.

10. SAME. *Failure to read indictment to jury. Effect.*

The fact that the indictment in a capital case was not read to the jury is no ground for a reversal of the judgment against the defendant, where it appears that the jury was fully informed as to the charge against the accused.

11. SAME. *Absence of defendant's counsel when verdict received.*

The absence of, and failure of the court to have called, the defendant's counsel when a verdict convicting him of murder was returned and received and the jury discharged, is not a good ground for a new trial, if the jury was polled, as the defendant's counsel, if present, could only have demanded that.

12. SAME. *Verdict of "guilty" with plea for mercy of the court. Surplusage.*

The jury trying an indictment for murder returned a verdict in these words: "We, the jury, find the defendant guilty as charged in the indictment, and plead the mercy of the court." The jury was polled. Each juror was asked, "Is this your verdict?" and each responded, "It is." *Held,* that this verdict is good, and the words, "and plead the mercy of the court," are mere surplusage.

13. SAME. *Surplusage in verdict. Inquiry and explanation concerning.*

The circuit judge might properly have inquired of the jury what was meant by the addition of such surplusage to their verdict, and have received the explanation thereof; but where the circumstances attending the finding and return of such verdict do not raise a just doubt of the concurrence of the entire jury in the verdict of "guilty," this court will not disturb the verdict, though no inquiry was made by the judge, nor explanation given by the jury, as to the meaning thereof.

14. SAME. *Effort to set aside verdict upon affidavit of juror.*

Such verdict cannot be set aside upon the affidavit of one of the jurors who returned it, to the effect that it was the intention of the jury to render a verdict which would result in the defendant's imprisonment for life; nor could it be set aside upon the affidavits of all of the jury to the same effect.

15. SAME. *Verdict of "guilty." Death penalty, how avoided.*

Where all the members of a jury concur in finding a defendant guilty of murder, he cannot escape the capital punishment consequent upon such verdict, except by the concurrence of the entire jury in fixing therein his punishment at imprisonment for life.

16. SAME.  *Verdict fixing penalty.  Failure of court to instruct.  Effect.*
    Where, in the trial of an indictment for murder, no instruction was asked with
      reference to the power of the jury, under the statute, to fix the penalty of
      guilt at imprisonment for life, nor as to the form of their verdict in exercise
      of that power, it is not a good ground for reversal of a judgment of convic-
      tion that the court failed to give such instruction.

APPEAL from the Circuit Court of Copiah County.

HON. T. J. WHARTON, Judge.

Robert G. Penn and H. B. Penn were jointly indicted upon the charge of having murdered Robert B. Rials on the 8th day of April, 1884. They were arraigned and plead " not guilty." A severance was granted the defendants, and on the 10th of May, and during the progress of the trial of another case, the consideration of which had been adjourned to a future day, a special venire was ordered and drawn in the case against Robert G. Penn, and a day was set for the trial of the case. His counsel objected to having his case taken up while the trial of another case was pending, but the objection was overruled and an exception taken.

The case against Robert G. Penn was called for trial on the 15th of May, 1884, and he was about to apply for a continuance, when, at the instance of the district attorney, the court ruled that under § 3059 of the Code of 1880 the defendant could not be granted a continuance on account of the absence of any witness or witnesses who had not previously been present and answered to the call of his or their names, " unless for cause coming to the knowledge of said defendant after the drawing of the special venire." To this ruling the defendant excepted.

The defendant applied for a continuance of his case because of the absence of L. D. Yates, E. L. Bowen, and Calvit Roberts, whom he wished to use as witnesses. Subpœnas had been issued for all of them, and Yates and Bowen, who had been served and responded to the call of their names, were present on a previous day of the term when the case was set for trial ; the subpœna for Roberts was returned, " Not served for want of time." The application was accompanied with the defendant's affidavit, stating that " compulsory process will obtain the attendance of said absent

witnesses, and that he has had no opportunity of obtaining such process." The court overruled the application for a continuance, " and ordered that said defendant should proceed to trial without the attendance of said absent witnesses," to which action of the court the defendant excepted. The view taken by this court of the application for continuance renders it unnecessary to state here the facts which the defendant claimed he could prove by the absent witnesses.

The defendant's counsel insisted that the district attorney should " admit the statements which it was alleged said absent witnesses would make in his behalf, subject to contradiction under the statute," which the court refused, and the defendant excepted.

W. T. McDade, presented for a juror, after having been examined by the court and district attorney as to his qualifications, " was turned over to defendant's counsel for further examination without being pronounced competent or incompetent by the court, and without being accepted or challenged by the State's attorney." The defendant's counsel declined to say whether he wished to examine McDade " until the court had decided as to his competency upon the examination already made, and until the district attorney decided whether he would accept him as a juror." The court refused to decide as to his competency or to require the district attorney to accept or challenge him, " but reserved an opinion as to his competency until the examination was through." To such action of the court the defendant excepted.

M. M. Gandy, after having been examined by the court and district attorney touching his qualifications for service as a juror, was turned over to the counsel for the defendant, who " declined to examine him until the court had passed on his competency and the district attorney had accepted or challenged him." Whereupon Gandy was declared to be competent for a juror and was accepted by the district attorney. Defendant's counsel then proposed to examine Gandy as to his qualifications as a juror, but the court refused to permit the examination, and required the defendant to at once " accept or peremptorily challenge said juror," to which action of the court the defendant excepted.

In answer to inquiries propounded by the court, Gandy stated that " he was not related to the prisoner or deceased, and though he had conversed with one of the State's witnesses, had not any fixed opinion in his mind as to the guilt or innocence of the accused, and was impartial between the defendant and the State."

In the trial of the case T. P. Ware, a witness for the State, testified that on the night before the killing the defendant sought a conversation with him, and he was proceeding to state what he had told the defendant of a conversation which had occurred on the same night between the deceased and the witness, when the defendant's counsel objected to the admission of such evidence on the ground that he was not present when the conversation between the deceased and the witness took place.; but the court overruled the objection, the evidence was admitted, and the defendant excepted.

Parts of the testimony of Carey C. Birdsong, J. A. Lovelace, T. D. Aiken, and M. L. Berberovitch, witnesses for the defendant, were excluded from the evidence, but the character of the same and the grounds of its exclusion are sufficiently indicated in the opinion of the court, and need not be here stated.

John McLemore, a witness for the State, testified as follows : " I had a conversation in last February with R. G. Penn with reference to Hans Penn's (H. B. Penn's) difficulty with Rials on Christmas last. I asked him how Hans was getting on. Said Hans was suffering a good deal. Defendant said when Hans got well he expected Hans and Rials would have it over—Hans would fix him ; it was not done with. That when Rials and Hans had the trouble he, defendant, would have shot Rials that day, but was prevented ; that Hans would fix him. Defendant said Rials had better stay away ; that he was gone away and had better stay away." The defendant objected to the admission of this testimony in evidence, but his objection was overruled and he excepted.

A part of the testimony of D. C. Wright, a witness for the State, was admitted over the objection of the defendant, who excepted to the court's action in respect thereto. The purport of the testimony

thus brought in question, together with the evidence bearing upon it, is fully stated in the opinion of the court.

The proof shows that H. B. Penn and Rials met between ten and eleven o'clock on the 8th of April, 1884, in the town of Hazlehurst; some conversation ensued between them; Penn took hold of Rials; they clinched; Penn stabbed Rials; then each drew his pistol, and at about the same time R. G. Penn came up; many shots were fired by the three parties; Rials fell, having received seven wounds, five of which were fatal; several of these wounds were inflicted by the defendant, and one of them after Rials had fallen; at least one of the fatal wounds was inflicted by the defendant. There were a great many witnesses on either side and the evidence was conflicting, but the facts just stated seem to be established beyond doubt. It was also shown that on Christmas day last preceding the killing, there had been a fight between Rials and H. B. Penn, and it seems clear from the evidence that Rials had tried to have a peaceable settlement of his differences with the Penns and to avoid any further violence.

The following instructions given for the State were excepted to by the defendant:

"2. Malice is implied by law from any deliberate, cruel act, committed by one person against another, however sudden.

"7. If a man voluntarily enters into mortal combat with his adversary and kills him in such combat it is murder.

"10. If the jury believe from all the evidence in the case that Hans Penn is guilty of the murder of R. B. Rials beyond a reasonable doubt, then if the jury believe from the evidence that the defendant, R. G. Penn, was there present, and at the beginning and during the progress of the fight also deliberately shot Rials with the intention to kill him, then R. G. Penn is guilty of murder, however honestly he might have believed his brother's life to be in peril at the hands of Rials while defending himself against H. B. Penn.

"12. Even if the jury believe from the evidence that Rials was the aggressor at the beginning of the fight, and that H. B. Penn was at the beginning justifiable in shooting Rials, yet if the

jury further believe from the evidence, beyond a reasonable doubt, that Rials had, by wounds already inflicted upon him, become disabled, and was down on the ground on all-fours, making no apparent effort to continue the fight, and was unable to continue the fight or do harm to defendant or H. B. Penn, and that all danger or apparent danger to the Penns, or either of them, at the hands of Rials had ceased, and that the Penns had stepped away from him, and then the defendant ran up and deliberately shot him, inflicting a mortal wound upon him, then defendant is guilty of murder, and the jury should so find."

Exceptions were taken to the action of the court below in refusing several instructions asked by the defendant, but it is unnecessary to set out those instructions here, as this court has not passed upon them, except to indicate that the appellant's defense was fully covered by the instructions given in his behalf, and that he has no ground of complaint because of the court's refusal to reiterate the law applicable to his case.

The jury returned a verdict in the following language: "We, the jury, find the defendant guilty as charged in the indictment, and plead the mercy of the court." The jury was polled, and each juror in response to the question, " Is this your verdict," answered, " It is."

The defendant made a motion for a new trial, and in support thereof proved that he had no counsel present when the verdict was returned into court and the jury discharged. He also presented in support of his motion the affidavit of J. T. Morrison, one of the jurors who rendered the verdict, in language as follows : " The indictment was never read to or in the hearing of said jury at any time in the course of said trial. When the jury returned their verdict they did not intend to render any verdict which would inflict the death penalty on said defendant, but they agreed alone to a verdict which would confine the defendant in the penitentiary for life or such time as the court, exercising the mercy recommended, might adjudge. When said verdict was returned into court, the judge replied that he had no power to extend mercy, and proceeded to remark to the jury : ' If you mean to send him for lifetime to the penitentiary,' and was then interrupted by the district attorney,

who said, 'We will poll the jury,' when J. F. Cammack, one of affiant's fellow-jurors, standing within a few feet of affiant, said, 'If you wish to know what we mean by the terms, Plead to the court for mercy, I will explain,' when he was stopped by the district attorney polling the jury, and the jury was discharged without giving the said Cammack the opportunity to say what he and his fellow-jurors did in truth mean by their verdict. Affiant and Cammack and others of said jury refused most positively to agree to the rendition of a verdict which should involve the life of the defendant; and affiant and Cammack and all his fellows did agree only to the rendition of a verdict which should imprison for life ; and that was the meaning, purpose, and intention of said jury, each and every one of them, when they added the words, 'and plead for the mercy of the court.' Affiant said to his fellow-jurors that he would stay in the jury-room until he died before he would agree to any verdict which involved the life of the defendant, and thereupon the whole jury agreed to said verdict, intending only a verdict which would imprison the defendant in the penitentiary for life." The court refused to consider this affidavit or to allow Morrison to be examined in open court, and to such action of the court the defendant excepted. The clerk of the court testified that the indictment was not read to the jury during the trial of the case, but said that he gave it to the jury when they retired to consider of their verdict. And he and several other witnesses made statements similar to that contained in Morrison's affidavit as to what transpired in the court-room in connection with the return of the verdict, the offer of Cammack to explain the meaning thereof, and the polling of the jury.

The motion for a new trial was overruled, and the defendant excepted. He was sentenced to be hanged, and from such judgment appealed to this court.

*C. E. Hooker,* for the appellant.

I shall first call the attention of the court to the assignment of error, that the court erred in overruling the motion made by the defendant for a new trial, and especially to the action and conduct of the court and the *district attorney* when the jury returned their

verdict into court, and to the occurrences then and there transpiring.

There is no principle of law better established in our jurisprudence than that the jury must be composed of jurors fair and impartial, and that the defendant has the right to be represented before such a jury at all times, from the impaneling of the jury until the final rendition of the verdict of his peers; and it may be of as much importance to the rights of the defendant to be represented by counsel at the rendering of the verdict as at the pleading or during the argument addressed to the jury.

It was the duty of the attorney for the State and the judge to watch the interest of the defendant, and not to have hurried the jury to a dismissal, and thus suppressed the explanation which the juror desired to make and which he had the right to make. In a decision rendered at the present term of this court by Associate Justice Arnold in the case of *Wingo* v. *The State* the right of the prisoner to be at all times represented by counsel is ably and exhaustively discussed, and this cause was reversed simply because the court below had curtailed the right of defendant's counsel to make an argument in his defense and had limited his counsel to thirty minutes each.

We submit, further, that it was the imperative duty of the honorable judge who tried the case in the court below, when he saw that the verdict was uncertain, ambiguous, and indefinite, not to have permitted his district attorney to have hurried said jury by the process of polling to a speedy and instant discharge, but to have interposed in protection of the defendant and of the purity and impartiality of the verdict to be rendered, and more especially was this his duty when one of the jurors was attempting to explain what was meant by the jury in " pleading the mercy of the court." We respectfully submit it was the solemn duty of the judge who tried this case in the court below to have explained to the jury the form and character of the verdict; that they had the right under the law as it now exists to find the defendant guilty of murder, and the law affixed the penalty of death; or they had the right to find him guilty of murder, and affix the penalty of imprisonment for

life in the penitentiary; or they had a right to find him guilty of the offense of manslaughter. And he should have directed the jury to retire to their room and agree upon such verdict as they might see fit. In support of the opinion which we have here expressed, and which we think sustained by authority, see *Hughes* v. *The People*, 12 Ala. 458.

The Constitution of Mississippi, § 7, art. 1, provides, "In all criminal prosecutions the accused shall have a right to be heard by himself or counsel or both." We submit, therefore, it was the duty of the judge in the court below to see that the defendant was at all times represented by counsel, and if he had none to have appointed them for him. In support of this view we cite *Smith* v. *State*, 37 Am. Rep. 845; *State* v. *Austin*, 6 Wis. 203; *Rothbauer* v. *State*, 22 Wis. 468. In the case of *People* v. *Finn*, 37 Cal. 274, it was held that where the jury were brought into court and charged in absence of prisoner's counsel it was a fatal error, and the cause was reversed.

We submit, in view of all the facts and circumstances occurring at the time of rendering the verdict in this case, it cannot come within the principle laid down in *Traube's Case*, 56 Miss. 152, and other authorities, which say that immaterial or unmeaning words will be treated " as mere surplusage."

We further submit to the court that the court below erred in the ruling made in the case of the two jurors, McDade and Gandy. In the case of the former, the court, after making examination as to competency, turned the juror over to the district attorney and then turned him over to the defendant, requiring him to examine him before the district attorney had passed on the jury. This, we think, is in contravention of the rule that the State must first pass on jurors. In reference to the action of the court in case of the juror Gandy, when examined on his *voir dire*, it clearly falls within the rule laid down in *Logan* v. *State*, 50 Miss. 276, Judge Simrall delivering the opinion of the court. See also *Brown* v. *State*, 57 Miss. 424.

From the inception of the trial, the attorney for the government persistently urged the trial of the defendant. First the case was set

for a day and a *venire* drawn returnable to that day without according to them their constitutional right of process by subpœna and attachment to secure attendance of their witnesses, and when the day arrived they made their application for continuance on account of the absence of three material witnesses.

We submit that the constitutional right of defendant "to have compulsory process for obtaining witnesses in his favor" is absolute, and that no legislative enactment and no judicial construction of any legislative enactment by the court can deprive him of this constitutional right. That this was done in this case there can be no question.

The twelfth assignment of error relates to the action of the court in permitting the testimony of T. P. Ware, a witness for the State, to go to the jury. It will be seen by reference to Ware's testimony that many of the declarations of the deceased were received in evidence (at second-hand by Ware's recital) to affect this defendant when he was not present or within hearing.

The thirteenth assignment of error relates to admission of D. C. Wright's testimony to affect this defendant (held night before the killing) not in presence or hearing of defendant.

Surely it is not necessary to say that this testimony could not be manufactured by deceased to affect either of the defendants charged in this indictment, especially when the court will gather from all the evidence in the record that the whole theory of the prosecution rested on fixing a conspiracy and agreement on the part of the Penns to take the life of the deceased. The testimony of what occurred at the depot the night before and the evidence of Wright and Ware were all relied upon in the court below to show a conspiracy between the Penn brothers to kill Rials. But whether for this or any other cause, this evidence was violative of the first plain rules of evidence.

This evidence of Ware and Wright was improperly admitted, and especially that part of Wright's testimony in Berberovitch's saloon, in which Wright is allowed to repeat the saying of deceased : "There are those Penns. Do you not see they are pursuing and intend to kill me ?"

The fourteenth assignment of error is that the court erred in excluding testimony of Carey C. Birdsong, a witness introduced in behalf of the defendant. The testimony of this witness, read in connection with the testimony of E. M. Bostic, the chief witness for the State in the court below, will be intelligible and show its pertinency to the case.

The court below in its rulings opened wide the door to show any act, word, or expression of either of the defendants, made at any time or place, and shut the door in the face of defendants when they offered evidence tending to show, and, we submit, absolutely showing, a consistent agreement and conspiracy between Rials, deceased, and Bostic, the witness, to make an attack on the Penns on the morning of the killing.

The fifteenth assignment of error relates to the exclusion of the testimony of T. D. Aiken, which was at first not objected to, but after the evidence of Birdsong, the jury were, by the district attorney's motion, asked to retire, and a motion was made to exclude the previous testimony given by witness, Aiken, to this effect: that on morning of killing, about one hour and a-half or two hours before, the deceased and Bostic were seen by witness in Berberovitch's saloon, Bostic with his two pistols exhibited, and Rials remarking, pointing to the right-handed pistol in Bostic's hand and saying, " That is the pistol with which I shot Hans Penn on Christmas," thus showing that he had been arming his confederate with his own weapons, and that the Penns, and what had been done to them, and what was to be done, was the subject-matter of thought uppermost in the mind of deceased and his intimate friend, State's witness Bostic, and pulling out his own formidable pistol and asking, " How will this do, grandpap ?" We submit to the court that this was surely competent evidence to show concert of action in a common design, and in connection with other testimony defendant had a right to ask of the court it should go to the jury for what it might weigh in establishing conspiracy. The witness Berberovitch proved the same facts, and they were ruled out. We submit they were also competent, and especially that it was competent to contradict the State's witness, Bostic, who had sworn

in his own testimony in chief "that Rials, the deceased, had handed him one of the pistols he had on at the scene of difficulty, *only a half hour before the killing, to hand to its owner.*" But this, too, was excluded.

The sixteenth ground of error is that the court erred in excluding the testimony of the witness, Lovelace, who proved that on the morning of the killing he saw. Bostic, the witness, and he said to him (a short time before the killing), pulling out one pistol, "This will fix them," meaning the Penns, and putting that up and pulling out another, said, "If that fails this will not, for it never goes back on me;" for the same reason we submit this was improperly ruled out, as it contradicted Bostic, a State's witness, as to a material fact sworn to by him, and for further reason, that if the conspiracy had been established then the declaration of any one is good as to all. To rule out all this testimony was equivalent to saying, "Though a conspiracy may exist to take your lives, you sha'n't prove it."

The seventeenth assignment of error relates to testimony introduced by the State, of John McLemore, who was by the court permitted to go back to December before the killing and relate a. conversation had with defendant at bar, at the shop of his father, in which he said it was not over, that Hans would fix him, etc. Surely it was not competent to go so far back and bring up every expression and word uttered by defendant to affect him and show his feeling to deceased.

We will call the court's attention to some of the instructions asked and given for the State, and first to the seventh. "If a man voluntarily enter into mortal combat with his adversary and kill him in such combat, it is murder." We submit that this instruction is too broad; it should have been qualified by saying, unless it was done in self-defense.

The refusal to give the eighteenth instruction for defendant, we submit, comes within the rule laid down in *Statem* v. *State,* 30 Miss. 624, one of the early decisions as to justifiable homicide, where a felony was about to be committed on another.

I will simply call the court's attention to the last assignment of

error, that the indictment was never read to the jury, either at the beginning of the trial or at any time during the taking of testimony or argument of the case, nor was the plea of defendant read or stated at any time to the jury, though the record does show that there had been an arraignment and plea of not guilty some six or seven days before the trial was begun. There is a great paucity of authorities on the subject, arising, I presume, from the fact that in a case of this magnitude such an omission has seldom or never been made. The only direct authority we find on the point is in Caruther's *History of a Lawsuit,* who in § 833 lays down the rule that the "attorney for the government must *first* read the indictment to the jury and then the plea must be read, or may be stated to the jury." This, together with an Alabama case, are the only authorities found directly on the point.

*J. S. Sexton,* on the same side.

1. The first error assigned is the admission of the juror Gandy as a member of the jury. It was the duty of the court when the juror stated that he had talked with the State's witnesses, and indicated that he had formed an opinion from such source, though, as he said, not a *fixed* opinion, to have excused the juror, and no failure of counsel to examine the juror could qualify him when the law says that he was disqualified, and it was useless for counsel to examine him on behalf of defendant until he was accepted by the State.

2. The second and third assignment of errors can be treated together. The witness, T. P. Ware, testified over the objection of defendant that he had a conversation with the deceased the night before the homicide in which deceased stated to him that the Penns, meaning appellant and his brother, wanted to mob him, but that he, Rials, wanted to have a peaceable settlement. This conversation took place out of the hearing and presence of the Penn brothers, or either of them. D. C. Wright, a witness for the State, testified that on the night prior to the homicide he met Rials in a saloon on Front Street in Hazlehurst, and Rials asked him if he, witness, had a pistol, in a low tone of voice which he did not think could be heard by Penn brothers, who were also in the saloon, and

witness said no.   When witness asked Rials what he wanted with a pistol, deceased said these men, the Penns, are following me up, and have been all night, and intend to kill me.

Upon what earthly principle of evidence, common justice, or common sense this testimony was admitted I am utterly at a loss to know.   The defendant was a stranger to it, and could neither assent to nor deny it.   Its admission was, to put it mildly, simply absurd, and its effect was all powerful.   It prepared the jury in the outset to look and hunt for murder.

It is impossible to say just how much evidence, improperly admitted, will cause a reversal, but if this was the only error assigned, we think there should be a reversal in this case under the rule of our supreme court laid down in *Lynes* v. *State*, 36 Miss. 626.   This authority is selected and approved by one of the latest writers on evidence, Reynolds' Stephen on Evidence, 184, (B).

3. The fourth, fifth, sixth, seventh, and eighth assignments of error all relate to the same subject-matter, and can all be treated together.   The theory of the defense in the court below was that the deceased and one E. M. Bostic conspired to kill H. B. Penn, the brother of appellant, and that they armed themselves on the morning of the homicide and approached H. B. Penn with a view of carrying out their purpose; that the deceased demanded a settlement of H. B. Penn, and when asked how he wanted to settle the difficulty Rials drew his pistol, and thereupon H. B. Penn drew his pistol, and R. G. Penn drew his, and the killing occurred. If the theory of the defense was true, or if the evidence established *primâ facie* a conspiracy between deceased and E. M. Bostic to take the life of H. B. Penn, then the declarations and acts of E. M. Bostic were the acts and declarations of the deceased, and should have been admitted in evidence under the facts of this case. 1 Green. Ev., § 111; 2 Starkie Ev. 327 ; Whar. Am. Cr. L. 261, 262, and cases there cited ; *Browning* v. *The State*, 30 Miss. 669.

4. The eleventh assignment of error is founded upon erroneous instructions granted by the court.   The second instruction given for the State announces a mere abstract proposition of law and is not calculated to enlighten the jury.

The seventh instruction for the State is not applicable to the facts of this case.

The tenth instruction for the State is erroneous, and is on a most material point. By it the jury are instructed in substance that R. G. Penn's guilt or innocence is to be measured by that of H. B. Penn.

The eleventh instruction for the State is subject to the same objections, and was an additional repetition of an erroneous instruction on a material point. The twelfth instruction given for the State is objectionable in a double sense: it is not supported by the evidence and it is not the law.

5. The twelfth assignment of error is for refusing instructions asked for the defendant.

The second instruction asked by the defendant was peculiarly applicable to the facts in this case, and is unquestionably the law, and is nowhere covered by other instructions.

The third instruction asked for the defendant and refused by the court simply invokes the rule laid down in *Long's Case*, 52 Miss. 23, and should have been given.

6. The thirteenth assignment of error is that the court received the verdict in the absence of defendant's counsel. Upon this point, as upon almost any other, authorities can be found on both sides of the question, but I submit a few of what I consider the best considered authorities which go to show that this was error. *People* v. *Trim*, 37 Cal. 276; *Martin* v. *State*, 51 Ga. 568; 1 Pin. 644; 6 Wis. 205; 22 Wis. 468; 51 Wis. 615; 52 Miss. 224.

Can any sane man doubt for a moment that if the attorneys for the defendant had been present when the juror Cammack undertook to explain to the court what they meant by pleading the mercy of the court, that he would have had a full opportunity to have done so?

7. Just in this connection we will refer to the fifteenth and sixteenth assignments of error. It was assumed by the district attorney in the court below and accepted by the court as the law, that a juror is not allowed to explain his verdict. That a juror is not allowed to impeach his verdict by showing his own miscon-

duct or that of his fellows no one will deny, but it is by no means repugnant to this principle to allow a juror to explain the verdict and thereby fortify and sustain it. In *Prussel et al.* v. *Knowls,* 4th How. Miss. 94, our court holds "that a juror shall not be permitted to repudiate his own conduct or to invalidate his verdict. It has, however, never been held to be repugnant to the principles or policy of this rule to fortify and sustain their verdict, or to show by affidavit the verdict which they did really intend to find."

8. The fourteenth assignment of error is predicated upon the idea that it is the duty of the court in all murder cases to instruct the jury that it is their duty, if they find the defendant guilty, to say whether his punishment shall be death or imprisonment for life. I am aware of the fact that at first blush this proposition seems to be in contravention of § 1714, Code of 1880, but I do not so consider it. That provision of the code refers to instructions upon principles of law applicable to the case given to assist the jury in arriving at a proper verdict. But in this case, as held in the Walton case, this is not the only duty of the jury. "They are charged with the duty of determining which of the two punishments shall be inflicted," and that duty, says the court, "necessarily involves the idea of knowledge as to the alternatives about which the choice is to be exercised," and further holds that the jurors, "so far as relates to principles of law applicable to the case before them, are presumed not to know the law." Then if it is their duty to say what punishment shall be inflicted, and if the idea of duty involves the idea of knowledge, and without instruction they are presumed to be ignorant, it necessarily follows that they must be instructed by the court, whether requested or not, as to this superadded duty which is no part of their verdict.

*C. E. Hooker, J. L. Meade,* and *J. S. Sexton,* for the appellant, argued the case orally.

*T. S. Ford,* Attorney General, for the State.

1. The first, fifth, sixth, seventh, eighth, and ninth assignments of error are not well taken. Section 3059 of the code, in reference to motion for continuance after venire drawn, has been construed by the court in *Fletcher's Case,* 60 Miss. 675.

Bowen was actually present at the trial, and being introduced as the first witness for the State, swore he knew nothing about the case. So far as Yates, the brother-in-law of defendant, is concerned, it appears from an examination of the whole record that most of the facts proposed to be proven by him would have been inadmissible. He would not have been allowed to testify as to the absurd statement alleged in the affidavit to have been made by E. M. Bostic, for one sufficient reason, among others that might be assigned, that it is not alleged that what Bostic said was communicated to the Penns. In the light of the abundant evidence in the record as to the other matters proposed to be proven by Yates, it is manifest that the defendant has not sustained any prejudice by the absence of Yates at the trial.

2. As to the tenth and eleventh assignments, it is only necessary to say that it is competent for the court to conduct the examination of jurors. 60 Miss. 714. Counsel had full opportunity to examine McDade and Gandy as fully as they saw proper, but declined to do so. It does not appear that they had exhausted a single peremptory challenge when these jurors were tendered to defendant.

3. The seventeenth, twenty-first, and twenty-second assignments may be disposed of by saying that no exception was taken in the court below, upon which they are based, and they need not be noticed here.

4. Considering the fourth, twelfth, and thirteenth assignments of error together, we desire to state in a compact form the evidence in the case pertinent to a proper consideration of these assignments. With reference to the admission of the statements made by Rials on Monday night a few hours before the homicide, the declarations of Rials, objected to and proven by Wright and Ware, were to the effect that the Penns were following him and wanted to kill him. If this surmise on the part of Rials appears abundantly to have been proven true, this court should not disturb the verdict and judgment in the lower court. From half of the pages of this record it will appear that from the month of December up to within ten minutes of the homicide it was the purpose of this

defendant, at least, to bring the feud between the Penns and Rials to a fatal determination, and that it was literally true that the Penns on Monday night were following up Rials for the purpose of bringing him to bay at last and forcing him "to shoot it out." This was Dr. Penn's own language, as proven by many witnesses and not denied by himself when he took the stand. To show that Rials' surmise was true and that the Penns were seeking to kill him, we quote from the record.

Bill Brown testified that in the month of December, while Hans was still confined to the house, defendant said : " I would have killed Rials before now, but Hans wanted me to wait."

McLemore said that in February defendant remarked that when Hans got up he would fix Rials—that it was not done with ; that he (defendant) would have shot him that day if he had not been prevented.

Bostic on the 12th day of February went to defendant in behalf of Rials to effect a friendly settlement of the feud. Defendant then told Bostic that he would not own Hans as his brother if he made friends with Rials, and he would kill Rials himself.

Coon testified that seven days before the homicide defendant said, " Bob Rials wants to make friends with Hans, but if Hans makes friends with him, I will kill Rials myself and would not own Hans as brother."

On Monday night, less than twenty-four hours before the killing, Wright, Ware, and Millsaps prove the following circumstances, none of which appear to have been denied by either Hans Penn or Bob Penn when they took the witness-stand : That defendant and Hans Penn were first seen in Wilson's saloon by Wright and Redding and others. The Penns testify that they heard Rials say in the saloon as they were passing by that he (Rials) was going to kill Hans Penn in twenty-four hours, and that they then went into the saloon where Rials was. No other witness heard the threat of Rials, though one at least was there when the Penns state that it was made. Redding was in the saloon until Rials walked out with Wright, who took the arm of deceased as they passed the Penns. Hans and R. G. Penn remained in the saloon until Red-

ding left. Redding asked Hans if he were not going to the dance at Faler's Hall. Hans replied that he expected to have " a dance of his own to-night." Rials went to Faler's Hall, and presently defendant makes his appearance there, leaving Hans at the foot of the stairs. Rials saw defendant and again mentioned to Ware his apprehensions that the Penns were following and meant to attack him. At his request, Ware and others went down with him, passing Hans Penn at the foot of the stairs. Rials then went with Ware to Harris, Dodds & Co.'s store. Presently the Penns make their appearance there, and after a little while defendant called Ware to one side and asked him to advise Rials " to go out and let him and Hans shoot it out." Ware told defendant that Rials said that the Penns were going to mob him. Defendant said he (Rials) need have no apprehension of that; he (Rials) should have a fair showing if he would go out and shoot it out, and to tell Rials so.

Ware gave Rials defendant's message. Rials expressed a willingness to have an amicable settlement and told Ware he would see defendant next day. A short time afterward Rials appeared at the depot, and for the fourth time that night the Penn brothers came up and then attacked him, thus verifying the apprehension expressed by Rials to Wright and Ware; and then follows a scene detailed by Millsaps and Wright, to whose statements neither Hans Penn nor Dr. Penn on trial interposed any denial or explanation. Hans Penn tapped Rials on the shoulder, and he and defendant demanded to have it out right there. Rials protested that he was unarmed and had no friend, and asked Millsaps to interpose. Defendant, with his hand on his pistol, demanded that Rials should " shoot it out right there." Wright rescued Rials and carried him off.

We submit that if the declarations of Rials that the Penns meant to attack or kill him and were following him were improperly admitted, still the defendant has not been prejudiced, because these declarations are shown by competent evidence to have been the truth and their admission altogether immaterial.

5. The fifteenth, sixteenth, eighteenth, and twentieth assign-

ments of error are based on the alleged error of the court below in
ruling out the statements (foolish and signifying nothing) of E. M.
Bostic.   All the witnesses and defendants themselves admit that
Bostic took no part in the fight; that during the time Rials was
being riddled with bullets by the Penn brothers he stood by with
amazement and terror in his face.   It was not proposed to be
proven that the defendant or his brother had ever heard before the
killing of what Bostic had said to Lovelace or Aiken or Berbero-
vitch.   If they had not, and Bostic actually did nothing, what
light could the testimony of these witnesses have thrown on the
motive which actuated the Penns at the moment the conflict
began?   We submit that there was no error in the action of the
court here complained of.

6. As to the second and third assignments of error, we submit
that the instructions asked by defendant and refused by the court
were each in some respects imperfect, as not announcing the law
accurately, but, above all, in not being applicable to the facts.

7. The last assignment of error we submit is not well taken.
The very affidavit of Morrison upon which it is predicated shows
that the jury read the indictment and that they indorsed their ver-
dict upon the back of the indictment.   From the addresses of
counsel, the instructions of the court, and with the indictment in
their possession, they are bound to have known the issue, to which
they did actually respond in their verdict.   We cite a case which
is precisely in point: 53 Cal. Rep. 491.

We will now examine the sufficiency of the verdict, and whether
it authorized the court to pronounce the sentence of death.

The verdict is in these words: " We, the jury, find the de-
fendant guilty as charged in the indictment, and plead the mercy of
the court."

In *Traube* v. *The State*, 56 Miss. 153, the verdict was in this form:
" We, the jury, find the defendant guilty of manslaughter in the
second degree."   In affirming the judgment, the court said if there
is a perfect finding of the issue submitted, judgment will be pro-
nounced " regardless of the fact that the jury have found also some
other matter not submitted, or have added to their verdict certain

words of qualification which do not legally affect the perfect find-
ing." The added words, " and plead the mercy of the court," have
no legal significance whatever and are surplusage, which the court
rightly disregarded.   It is significant that the jury adhered to their
verdict after being told that the court had no mercy to ex-
tend.

It is contended that the jury should have been permitted to ex-
plain their verdict.   Upon this question the authorities here and
elsewhere are uniform in denying the right under the circumstances
of this case. 1 Hayne on New Trials 137, 138.   Jurors cannot
dissent from a verdict merely because they mistook its effect.
" While it is undoubtedly competent to a juror to disclose that the
verdict as presented is not his verdict, his dissent must proceed upon
the question of fact as determined by the verdict.   He is not at
liberty to dissent merely because he mistook the legal effect of his
verdict, or ascertains from a remark of the court that the judgment
to be rendered upon the verdict will be other than he had sup-
posed." *Fitzpatrick* v. *Hebbleman*, 48 Cal. 589.

Upon grounds of public policy it is almost universally agreed
that no affidavit, deposition, or other sworn statement of a juror
will be received to impeach the verdict, to explain it, to show that
they misunderstood the charges of the court, or otherwise mistook
the law or the result of their finding.   Thomp. & M. on Juries,
§ 440 *et seq.*

As the jury could not explain their verdict, and indeed adhered
to it after being admonished that the court could not extend mercy,
nothing was left but to pronounce the sentence of the law.   If the
wrong judgment was pronounced on the verdict, this court will
not reverse, but simply remand for the proper judgment.

We submit that none of the cases cited in support of the posi-
tion that the verdict should have been set aside because it was re-
turned in the absence of prisoner's counsel are precedents for the
court in this case.   In the cases cited, the verdict was received in
the recess of the court when counsel were not required to be present,
and by the absence of counsel the right to poll the jury was
lost.   The verdict of the jury in this case was received in open

court and the jury were polled. We are able to cite a case which is precisely analogous to the one at bar, 28 Am. Rep. 424, in which the verdict was upheld by the court of appeals.

We insist that the jury in this case were charged with but one duty, and that was to determine an issue of fact. It was, of course, competent for the court, at the request of the district attorney or the defendant, to place in their hands the determination of another question—whether the prisoner should be delivered from the capital punishment denounced by the law against murder. That the jury were charged by the court to determine only the question of fact as to guilt or innocence is owing, not to the omission of the court, but the failure of the defendant himself to ask the jury to fix the punishment. The court could not give the instruction of its own motion—could not, against the will of the defendant, charge the jury with the choice of life or death to the prisoner. He deliberately chose to leave the jury with simply the question of fact to determine, and upon their oaths they determined that issue against him. And it is to be remembered that while the jury all said that he was guilty of murder by their verdict, and on being polled each man responded that the prisoner was guilty as charged in the indictment, even if it had been left to the jury whether they should fix the penalty at imprisonment or leave the defendant to the law, it would by no means follow that the voice of one juryman would have been efficient in preventing a capital sentence. If, the jury all concurred in a verdict of guilty, they would have had likewise to have all concurred in fixing the penalty at imprisonment.

*T. S. Ford*, Attorney General, also argued the case orally.

CAMPBELL, C. J., delivered the opinion of the court.

It was not erroneous to draw the special venire and set a day for the trial of the case while another case was being tried. The continuance asked was properly denied. Bowen, one of the absent witnesses, because of whose absence the continuance was applied for, was produced and introduced on the trial by the State, and testified that he knew nothing of the case. The facts stated in the affidavit as provable by the absent witness, Roberts, were not ad-

missible.   Yates, the other absent witness, resided in an adjoining county, and might have been immediately obtained by attachment, so far as appears, and produced during the trial, which continued ten days, but he was not obtained, nor was his affidavit, on the hearing of the motion for a new trial; and all that it was alleged could be proved by him which was competent testimony was testified to by others.   The prisoner did not suffer from the absence of Yates.

The court rightly refused to require the district attorney to admit that the absent witnesses would testify as set forth in the affidavit for continuance.

The ruling of the court with reference to § 3059 of the code was correct.   That section does not abridge the right of the accused to have a fair and impartial trial with compulsory process for witnesses as secured by the constitution, but it very properly requires that an application for continuance for causes existing at the time of drawing a special venire shall be then made, and not afterward, unless a good excuse is shown for not having made the application before.   It is no wrong to the accused to require him, if he has cause for continuance when a special venire is drawn, to present it then, and not delay as to such cause until many have been brought into court to be dismissed upon a continuance of the case for causes existing when the venire was drawn.

The course of the court in requiring all examination of jurors as to their competency before passing on it was strictly correct. Opportunity was given the counsel for the prisoner to fully examine the jurors as to their qualifications, and as the privilege was declined when offered, it could not afterward be claimed.

The juror Gandy was free from objection.   The fact that he had conversed with one of the witnesses made no difference, as he had no opinion as to the guilt or innocence of the prisoner.   Code, § 3072.

The admission of Ware's testimony was proper.   It consisted of what was said between him and the prisoner on trial the night before the killing in an interview sought by the prisoner in which the relations between the Penns and Rials was the subject of conversation.

That part of Carey C. Birdsong's testimony which related to an alleged declaration of the witness Bostic was properly excluded, because by it the effort was made to contradict Bostic without having laid the foundation by asking him if he had used the language attributed to him by Birdsong at the time and place mentioned.

The foundation was laid to contradict Bostic as to what he said the next day after the homicide to Tom Ed. Groome, but it does not appear from the record before us that Groome was offered as a witness.

We do not decide that it would have been erroneous to exclude the evidence of Birdsong if the proper foundation had been laid, but decline to pass on that question as not presented, and put our decision on the ground above stated. On the same ground Lovelace's testimony was rightfully excluded, and for the further reason that it was irrelevant to the issue.

On the ground last mentioned the testimony of Aiken and Berberovitch was rightly excluded. It would have shown only that Bostic and Rials had pistols, and exhibited them at Wilson's saloon an hour or two before the killing, but this had no relation to the Penns and would not have thrown any light on the issue to be tried. That Bostic had two pistols and that Rials had one at the time of the homicide is abundantly shown by the evidence in the case. The foolish demonstrations and declarations proposed to be shown by these witnesses are not said to have been known to the Penns, and would have been of no value in the trial.

There is no just objection to the admission of the testimony of the witness McLemore.

The testimony of the witness Wright as to what Rials said to him the night before the homicide was improperly allowed to go to the jury. The purport of it was that Rials stated that the Penns were pursuing him and intended to kill him. This was not in the hearing of the Penns, and was not admissible against the prisoner, but it could not have harmed him, because the course and conduct of the Penns toward Rials Monday night was shown by many witnesses. It did appear as if the Penns were pursuing

Rials that night. He went into a saloon and they went in, attracted, they swear, by hearing Rials declare his purpose to kill one of them, and their object in going in was to see about it. No other person there heard the alleged declaration of Rials, and the speedy retirement of Rials escorted by Wright from their presence in the saloon must have impressed them with the belief that there was no danger from him. He returned to Faler's Hall and the prisoner and his brother went there, and the former entered the hall with no object, he swears, while the other remained at the foot of the stairs. Rials again called the attention of Wright to his pursuit by the Penns and left the hall attended by friends. In a little while Rials was in front of a store and the Penns arrived there, and the prisoner asked Ware to step aside with him, and had a conversation about Rials and the difficulty between Rials and H. B. Penn, and about "shooting it out" as the only way to settle it, and requested Ware to deliver a message on that subject to Rials. In a little while after this Rials was found at the depot and the Penns were there, and were cursing Rials and demanding that the difficulty should be settled then and there, as the most favorable time and place for it. Rials shrank from them; signified his desire to have a friendly and peaceful settlement; appealed to Rev. Mr. Millsaps, who was present, to say if he was not right in desiring a friendly settlement; declared he was not armed and had no friend there, and jumped behind Mr. Millsaps to put him between himself and his infuriated foes, when the witness Wright interposed to insist, in behalf of fair play, that Rials should be allowed to go for arms and a friend, and in that way got him away from the Penns. It is true they did not kill Rials that night. What would have been the result if Wright had not interfered as he did to get Rials off must be matter for conjecture. The homicide of Rials the next day, coupled with the occurrences of the night, already detailed, was proof of the fact that the Penns were following Rials Monday night intent on mortal combat. As this was made so manifest, the error of permitting Rials' declaration to Wright to go to the jury did not add anything to the array of evidence on this point.

The instructions given at the instance of the district attorney are free from error.

The prisoner got the benefit of all the instructions he was entitled to. The twelfth instruction for him gave the sanction of the court to the proposition that the jury should acquit if it believed the state of facts sworn to by the accused and his brother and some of the witnesses for him. The sixteenth instruction for the prisoner gave him the benefit of the broader proposition, that he was to be acquitted if he shot Rials under a reasonable apprehension that he designed to commit a felony on or do some great personal injury to H. B. Penn and there was imminent danger of the accomplishment of such design ; and other instructions informed the jury that any reasonable doubt of guilt entitled the prisoner to be acquitted, and that if any other reasonable hypothesis than his guilt could be found in the facts he was not to be found guilty. The particular theory of the defendant as to the character of the homicide was submitted to the jury specifically in the twelfth instruction he asked, and by the sixteenth he got the benefit of any other view which might be deduced from the evidence. After the court had fully covered the case, giving the prisoner the benefit of every principle of law applicable, it was not required to repeat the announcement of legal principles or to incur the hazard of confusing the jury by giving instructions not needed to guide it or calculated to mislead.

It made no difference that the indictment was not formally read to the jury on the trial. The only purpose of reading it would have been to inform the jury of the charge against the prisoner, and certainly the jury was well informed as to that.

It is regrettable that the prisoner's counsel were not present when the verdict was received, but as the jury was polled, and counsel could not have had anything more than that done if present, it cannot be said that any harm resulted from the absence of the counsel.

The court might properly have inquired of the jury what was meant by the addition to the finding of guilty the words, " and plead the mercy of the court." What took place suggests that the

idea of the imprisonment of the prisoner in the penitentiary for life was not in the minds of the jury, for had it been the juror, Cammack, would not have made the remark he did in response to the declaration by the judge that he could show no mercy.   The verdict is complete and good as rendered.   It is not hurt by the surplusage.   There is nothing in the addition to the finding or in what took place when the verdict was handed in and read out to induce a belief that the jury intended to fix the punishment at imprisonment for life.   Having concurred in finding that the prisoner was guilty as charged, it was necessary for all of the jurors to concur in prescribing the punishment at imprisonment for life to produce that result.   It does appear, unmistakably, that the twelve concurred in a finding of guilty.   It does not appear from the verdict as rendered or what was said at the time in reference to it that any juror, much less all, was dissatisfied with it.   As all said the prisoner was guilty, the duty of the court was to pronounce the sentence of the law, *i. e.*, the death penalty, unless all of the jury agreed on imprisonment for life as a punishment.   The jury was polled and each juror declared the verdict his.   This was after the judge had announced that he could show no mercy.   Surely, if the subject of punishment and a desire to save the prisoner from the penalty of death had occupied the minds of the jurors, some of them would have made it known, under the circumstances, in response to the inquiry, " Is this your verdict?" and all would not have assented to it without qualification or restriction, as they did.

It is true that since the trial the affidavit of one juror of the twelve who tried the prisoner has been produced as to the understanding and purpose of the jury, but it is not allowable thus to amend or impair the verdict.   It is significant that the affidavit of only one of the twelve was offered on this subject; but all are as incompetent to destroy their verdict as one is.

The counsel for the prisoner chose not to have the jury instructed that it might imprison the accused for life upon finding him guilty, and it is not allowable for him to escape the penalty the law imposes for his crime because of the fact that from some unexplained cause the finding of his guilt by the jury was added to

by a plea to the court for mercy.   If there was a just doubt of the concurrence of his twelve triers as to his being guilty of the charge on which he was tried, the verdict should not stand; but that all concurred in pronouncing him guilty as charged is beyond doubt, and is not questioned even by the affidavit of the juror produced on the motion for new trial.   .

We could wish that this apparent cloud upon the verdict had been dispelled, as we think it would have been, by hearing the response of the jury through Mr. Cammack, who undertook to speak for it, as to what induced the jury to add to its finding the words already given above.

The most probable suggestion is that the addition was made to meet the views or wishes of some of the jury, and explanation would have shown this, and the penalty of the law would have followed the finding of guilty, even although eleven of the jury might have willed otherwise.   If eleven of the jury, while assenting to the finding of guilty, had declared their dissent from the capital punishment of the prisoner, he would properly have been sentenced to death, for it is only when all concur in fixing that punishment that it can take the place of the sentence the law pronounces.

We have given this case that care and attention its importance makes proper, and have carefully considered the many grounds of error assigned and urged by zealous and able counsel for the appellant, with the result that there is in the record no error of sufficient importance to authorize a disturbance of the judgment of the circuit court; indeed, there is, as we have shown, but one error against the prisoner in the entire record, and that we regard as unimportant and harmless in view of all the developments of the trial.

*Affirmed.*