Syllabus.

PRICE CHISM v. THE STATE.

1. EVIDENCE. *Discrediting one's own witness. Adverse testimony. Surprise.*

   It is only where the testimony of a witness is *adverse* to the party calling him, and such party shows that he is surprised by his testimony, having had reasonable ground to believe he would testify in his favor, that such party is allowed to discredit the witness by proof of contradictory statements. The rule cannot be invoked if the witness does not testify adversely, but merely denies knowledge of the case. *Dunlap* v. *Richardson,* 63 Miss., 447.

2. SAME. *Murder trial. Witness denying knowledge. Former statements.*

   Accordingly, where a witness called by the state in a murder trial denies all knowledge of the homicide, the prosecution is not justified in attempting to discredit him by an examination, in which it is shown that he had previously made a different statement, and had testified favorably to the state before the grand jury.

3. INCOMPETENT EVIDENCE. *Admission of. Error not cured.*

   Error in permitting, over objection, such examination, which elicits statements of the witness tending to show his and defendant's responsibility for the murder, and to negative the defense of an *alibi,* set up by the accused, is not cured by immediately afterwards excluding such statements at the suggestion of the state, and instructing the jury not to consider them unless it can be positively affirmed that the accused was not prejudiced.

4. SAME. *Admitting incompetent evidence. Error. New trial.*

   When incompetent evidence of great import is deliberately introduced, and it cannot be said with confidence that no other conclusion than that of guilty could have been reached on the legal evidence, the fact that the jury was subsequently instructed to disregard the incompetent testimony, will not cure the error, and for this a new trial will be granted.

FROM the circuit court of Union county.

HON. EUGENE JOHNSON, Judge.

Appellant was convicted of the murder of one Brice Adair. The opinion states the case.

*Mitchell & Blair*, for appellant,

Filed a lengthy brief discussing different assignments of error, and, as to the questions passed upon by the court, making the following points:

1. It is common learning that the acts and declarations of a conspirator are not admissible against a co-conspirator after the execution of the conspiracy. This rule was violated in this case repeatedly. For a single violation, the judgment was reversed in the case of *Simmons* v. *State*, 61 Miss., 243.

2. We desire to call the attention of the court, in particular, to one violation of a rule of evidence in this case. As to the body of Luke Chism having been carried home, the witness, Tom Prather, was improperly allowed to state that John Palmer called him out and told him if he repeated what he had said he would kill him. The same objection applies to the acts and declarations of Aiken, Bulus Prather and others. In no view was this admissible.

3. The error relating to the examination of D. R. Cox is so gross, and shows such a plain violation of every fair and just mode of examining witnesses and conducting a prosecution, that we think it hardly necessary to argue it. Sometimes a party is allowed to impeach his own witnesses, but there must be a foundation for it. *Moore* v. *Railroad Co.*, 59 Miss., 243; *Dunlap* v. *Richardson*, 63 *Ib.*, 447.

The court allowed counsel for the state to introduce and reject testimony arbitrarily, to suit their fancy. The objections of the defense were overruled, and then, in some instances, after the testimony had worked its ruinous effect on the minds of the jury, it was excluded by the court on the mere suggestion of the state's counsel. The record does not contain even a suggestion that counsel for the state was misled. After being permitted to lay the foundation to contradict, they not only made no effort to do so, but suggested that the testimony be excluded, thus, it seems to us, confessing that the real purpose was not to contradict, but to prejudice the jury against the witnesses and the defendant. The

real question here is, not whether such examination can be allowed for the purpose of contradicting where counsel calling the witness has been misled, but whether it may be done for *effect*, when there is nothing to show that counsel had been entrapped. It will be observed that contradiction was not pretended or sought for in several of the questions.

4. The different rulings on the question as to the examination of witnesses, and the admissibility of testimony, were exceedingly important to the appellant. No conclusive case was made against him. In a moment of great excitement, in the night, Mrs. Adair and her son claim that they recognized appellant, though they say he was covered from head to foot. It is morally certain that, even under ordinary circumstances, this could not have been done. Mrs. Adair claims that she recognized the parties from their peculiar motions, and Luther Adair says he recognized them from their voices and motions. Neither explains the peculiar motions. As the evidence of identity is so unsatisfactory, and the charge against appellant is so dependent upon circumstantial testimony, the admission of incompetent testimony and the improper conduct of the case became matters of vital importance to the accused. It looks very much to us like the verdict is contrary to the evidence. If it was about balanced, and not entirely satisfactory, almost any error may have turned the scales against the defendant.

*J. D. Fontaine*, on the same side.

*Frank Johnston*, attorney-general, for the state.

It is objected that it was error to permit Thomas Prather to testify that John Palmer and others brought Luke Chism to his house on the night of the homicide, and, further, that John Palmer threatened to kill him if he disclosed the fact. It is argued that this testimony is inadmissible, for the reason that the declarations of the conspirators, made after the crime, are incompetent. This cannot be classed as declara-

tions or conduct after the accomplishment of the conspiracy. The acts and declarations of the conspirators in carrying Luke Chism to his home, and attempting to conceal the evidence of their crime, and to suppress the testimony of Prather and wife, are part of the *res gestæ.* The scene at Luke Chism's house immediately after the killing was but the sequel to the crime. The conspirators did not separate, and were engaged in a common design of concealing their crime.

These persons, by aiding Luke Chism in suppressing evidence of the crime, were accessories after the fact. The second crime followed fast upon the first, and was its logical sequel.

The threat made by Palmer to the witness, Prather, was not a declaration of a conspirator after the abandonment of the crime. The conspirators were then engaged in the common design of *concealing their crime* by getting Luke Chism away from the scene of the homicide, and in concealing the fact that he had been shot at Adair's house. Whatever was done or said by any of the parties at Luke Chism's house in furtherance of the common design was admissible and within the elementary rule. The conduct of Palmer in threatening Prather was a verbal act in the common design of concealing the crime. *Read* v. *State,* 20 Ga., 681. This was not a declaration of the conspirator, Palmer, in regard to the facts of the crime, but it was a verbal act contemporaneous with and forming a part of the design to efface the evidence of the crime, a purpose in which the accused was then engaged.

Finally, I submit that the conduct of Palmer, testified to by Prather, who testified to the same conduct on the part of the accused in attempting to suppress testimony, was immaterial, and did not prejudice the defendant. If the witness was believed, then it was true that the accused threatened him in case of disclosure, and the point was no stronger against him that somebody else did the same thing. The court will not reverse for non-prejudicial error. 3 Smed. & M., 42; 12 *Ib.,* 161; *College* v. *McIntosh,* 37 Miss., 671.

But the evidence was perfectly competent as part of the *res gestæ.* *Browning* v. *State,* 30 Miss., 656. The principle of that case clearly embraces the acts and declaration of the conspirators while engaged in a common design of concealing evidence of the crime immediately after its commission.

There are two answers to the objection in respect to the questions propounded to the witness, D. R. Cox. In the first place, the questions were not improper. In the next place, the court, immediately after permitting the questions to be asked, excluded the testimony.

It is competent for a party to prove that a witness whom he has called, and whose testimony is unfavorable, had previously made a different statement. 1 Greenleaf's Ev., §§ 44, 44a and note. *Melhuish* v. *Collier,* 15 Q. B., 878.

It is manifest, from the admission of the witness, that the state's attorney was taken by surprise. The witness had been before the grand jury, where he had testified to material facts for the state. The district attorney had a right to presume that he would again testify to these facts. It was not necessary for him to inform the court that he was surprised; that he was surprised manifestly appears. The witness was not impeached, either by assailment of his general character or by independent proof that he had made different statements. His former statements were not to be taken as independent testimony, nor did he stand as impeached in general character.

But there was nothing prejudicial in the action of the court, for it immediately excluded the questions and answers. It is impossible to perceive how the defendant was prejudiced in the slightest degree.

On the whole case, I confidently submit that justice has been done; that the verdict is abundantly sustained by the evidence, and that there is little or no reason to believe that a different result would ensue upon a second trial.

COOPER, J., delivered the opinion of the court.

On the night of July 7, 1892, at about one or two o'clock,

a party of six or more men appeared at the residence of Brice Adair. They surrounded the house and demanded admittance, saying they were officers of the law with a warrant for the arrest of Luther Adair, a son of Brice Adair. Brice and Luther Adair, suspecting the purpose of the men, refused to open the door, and seized their arms. The front door was broken open by two of the men, who were enveloped in a white covering, and wore white cloth masks upon their faces which wholly concealed their features. Immediately one of them struck a match, which failed to burn. The other one then struck another, and at the same instant his companion fired upon Brice Adair, inflicting a fatal wound, from which he soon afterwards died. The murderer instantly fired again, missing his victim. Luther Adair, about this time, fired upon the other man, who staggered back and fell, rose to his feet, and fell again, and was then carried from the premises by his companions, who soon afterwards retreated from the scene.

The neighbors were soon informed of the horrible occurrence, and many of them appeared at the residence of Adair. A search of the premises discovered a loaded and cocked pistol, dropped by some one of the assailants, and a bloody mask, with a bullet hole on the part of it which would be over the left side of the chin of one wearing the mask. A pool of blood was found at the spot where the man fired on by Luther Adair first fell, and another at the place where he fell the second time. Spots of blood were found along the route the retreating party had followed. The tracks of the horses along the road were also followed a mile or two, and in the direction of the residence of Luke Chism, a brother of the defendant.

At three o'clock that night, Dr. Murray, a physician, residing a few miles from the residence of Luke Chism, was called to attend him, by one Bulus Prather, who is also indicted as a participant in the murder of Adair. On arriving at the residence of Luke Chism, Dr. Murray found him suf-

fering from a gunshot wound on the left side of the chin, the bullet having ranged around the neck, and lodged in the muscles behind, from which it was extracted by Dr. Murray, who preserved it, and it, with the rifle of Adair, was presented to the jury on the trial of the case, and it is said that the size of the ball was of the caliber of the gun. No explanation was made to Dr. Murray of the circumstances under which Luke Chism was wounded. The pistol found in Adair's yard was identified by its owner, who testified that he had lent it to Luke Chism the day preceding the homicide.

The widow of Brice Adair, and his son Luther, were examined as witnesses on the part of the state, and testified that, although the two men who broke open the door were masked, they recognized them as Luke and Price Chism by the outlines of their forms, their carriage and their voices, though they attempted to disguise their voices, but, in the excitement of the moment, failed to uniformly speak in a disguised tone.

Thomas Prather and Eugenia, his wife, were introduced by the state, and testified that, at the time of the killing, they were living at the home of Luke Chism; that, on the night of the homicide, they were awakened by the screams of Mrs. Chism, and, upon going out of their room, they saw John Palmer, Bulus Prather, Ulysses Hamblin and the appellant, Price Chism, bringing into the house Luke Chism, who was then wounded in the chin; that these parties excluded the witnesses from the room.

Over the objection of the defendant, the witness, Thomas Prather, was allowed to state that John Palmer took him aside, and warned him not to speak to any one of what they had seen. Both Prather and his wife testified that the defendant gave them like warnings. These two witnesses, on cross-examination, confessed that they had perjured themselves before the committing magistrate and the grand jury. That, being examined before the magistrate and the grand

jury, they had stated that they were awakened by a gun-shot, and, upon going into the .yard, found Luke Chism lying near the corner of his house, and that Bulus Prather and the witness, Thomas Prather, had carried him into the. house.

One D. R. Cox was placed on the stand, as a witness for the state, and testified that he knew nothing of the killing of Adair. The prosecuting attorney then stated to the court that he desired to contradict the witness, and, to this end, proposed to ask him certain questions. The court then directed the jury to be withdrawn, and, this being done, the witness was asked the following questions:

" (1) Did you not, at the August term, 1892, of the court, state to the grand jury that Price Chism asked you to go with him to whip Luther Adair, and that you, Price Chism, and others went to Brice Adair's house, on the night he was killed, to whip Luther Adair, and, while there, that Luke Chism was shot, and Price Chism killed Brice Adair? (2) Did you not state to the grand jury at said term that, on the night Brice Adair was killed, you, Price Chism, Luke Chism, Fayette Chism, John Palmer, Frank Palmer, Bill Aiken, Bulus Prather, and Ulysses Hamblin and others, met at Mt. Zion church to talk and arrange about going to whip Luther Adair? that you objected to going, and the others threatened to whip you if you did not go? (3) After going before the grand jury, did you not leave, and go to the state of Arkansas, and were you not furnished money by Mrs. Luke Chism; and, while in Arkansas, did you not write to Governor Stone, and say to him that you were guilty, and, if so, what were the contents of that letter? (4) Were you not arrested and brought back here, and are you not now in jail? And did you not send for Mr. Stevens to come to see you in jail, and say to him there that you wanted to make a full statement, and say to him the same you had stated to the grand jury?"

The defendant objected to the questions being propounded to the witness in the presence of the jury, or to his being

permitted to reply thereto, which objections the court over-ruled, whereupon the jury was brought into court, and the counsel for the state, over the objection of the defendant, was permitted to propound said questions to the witness, who, over like objections, was permitted to answer, and said: (1) That he did make the statement inquired of in the first question to the grand jury, but did so to escape punishment. (2) That he did make the statement inquired of in the second question, but did so through fear, and on a promise of pro-tection. (3) That he did leave the state, and go to Arkansas; did not say Mrs. Chism furnished him money; did not write to Governor Stone, but his uncle, to whom he went in Arkansas, did write a letter. (4) To the fourth question, he replied that he was not arrested, but was brought back to the state, and was now in jail; did send for Mr. Stevens to come to the jail, and did say to him he wanted to make a full state-ment, and did repeat to him the statements he had made be-fore the grand jury, but did this because he was afraid, and had been promised protection.

The counsel for the state then proposed to read, in evidence, the letter referred to by the witness, which was objected to by the defendant, and the objection was overruled, but the state's attorney then declined to introduce it. The bill of exceptions states that after the witness had answered the questions propounded to him, and the defendant excepted thereto, "that counsel for the state then agreed that said testimony might be excluded; whereupon the court remarked, 'Then, it may be excluded;' when counsel for the defendant asked the court what part of the testimony was excluded, to which the court replied, 'Any part of it, or all of it;' and the jury was instructed by the court to disregard said testi-mony."

The defense sought to be established by the evidence in-troduced consisted of an *alibi*, which was supported princi-pally by the family of the defendant, or the relatives of those who were also under indictment for the murder of Adair.

Several of the witnesses who reached the house of Adair soon after his murder, testifiêd that both Mrs. Adair and Luther Adair then stated that they did not know who did the killing, as the parties were masked, and could not be recognized. The state, in turn, introduced a number of persons who contradicted the witnesses for the defense by testifying that, soon after the occurrence, they had stated that Mrs. Adair and Luther had immediately declared Luke and Price Chism to have been the men who broke open their door and shot Brice Adair.

It is at once apparent, from the foregoing statement of the case, that the only question worthy of serious consideration by the jury was whether Price Chism was, in fact, one of the party by whom the murder was committed.

If we could say with confidence that no other conclusion could be arrived at by the jury on the competent evidence introduced, it would be our duty to affirm the judgment, regardless of any minor errors that may have been committed on the trial. We should not consider mere inaccuracies in the instructions of the court, or errors in the admission of fragments of incompetent testimony. But the crucial question was, was the appellant one of the murderous crowd of lawless men who appeared at the residence of Brice Adair and barbarously put him to death? And on this vital question the court below admitted grossly incompetent and material evidence. It is difficult to characterize, within the limits of judicial expression, the flagrant disregard by the trial court, not only of the principles governing the production of testimony, as formulated by the approved text-writers, but of the direct and positive decisions of this court.

The course pursued in the examination of the witness, Cox, is fatal to the conviction secured by the state. The verdict must be vacated, if the security of an impartial trial on competent evidence is to be preserved to one accused, it may be unjustly, of crime. No reputable writer, no court of authority has ever, in any age, given support or countenance

to such evidence. Mr. Greenleaf, in his work on Evidence, with great brevity and precision, notes the rule, with its proper limitations, under which a party introducing a witness may attack his credibility by proving previous contradictory statements by him. He says: "Whether it be competent for a party to prove that a witness whom he has called, and whose testimony is unfavorable to his cause, had previously stated the facts in a different manner, is a question upon which there exists some diversity of opinion. On the one hand, it is urged that a party is not to be sacrificed to his witness; that he is not represented by him, nor identified with him; and that he ought not to be entrapped by the acts of a designing man, perhaps in the interest of the adversary. On the other hand, it is said that to admit such proof would be to enable the party to get the naked declaration of a witness before the jury, operating in fact as independent evidence, and this, too, even where the declarations were made out of court, by collusion, for the purpose of being thus introduced. But the weight of authority seems in favor of admitting the party to show that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial, or to what the party had reason to believe he would testify, or, that the witness has recently been brought under the influence of the other party, and has deceived the party calling him. For, it is said, this course is necessary for his protection against the contrivance of an artful witness, and that the danger of its being regarded as substantive evidence is no greater in such case than it is when the contradictory declarations are proved by the adverse party." 1 Greenleaf on Evidence, § 444.

The mere statement of the rule, in any form in which it may be expressed, it would seem, should serve as a guide to the circumstances of its application. The first and essential thing is, that the testimony of the witness must be adverse to the cause of the party by whom he is called; and the second is, that the party is surprised by such evidence, hav-

ing had reasonable grounds to believe that the witness would testify in his favor.

Under no possible view can it be said that the witness, Cox, testified unfavorably to the state. He stated no fact tending to prove that the defendant, Chism, was not guilty of the murder of Adair. He only asserted that he, the witness, had no knowledge upon the subject of the killing.

We do not hesitate to affirm that no decision of a court or opinion of an approved writer can be found to support the admissibility of such evidence as was admitted in this case. But, in two recent decisions of this court, it has been distinctly held that a witness cannot be contradicted by evidence of other and different statements made by him, unless it be shown that the party calling him was surprised by his testimony. *Moore* v. *Railroad Co.*, 59 Miss., 243; *Dunlap* v. *Richardson*, 63 *Ib.*, 447.

In the latter case it was said : " In the absence of a statute authorizing it, a party is not allowed to discredit a witness voluntarily called by him by proof of contradictory statements previously made by the witness, unless it is shown by evidence, to the satisfaction of the court, that he has been deceived or misled by fraud or artifice practiced on him by the witness."

There is an entire absence of any thing in the record tending to show surprise on the part of the state. There is not even the assurance of counsel that such was the case. But, upon the mere suggestion of the state's attorney that he wished to contradict the witness (who had testified to nothing material to the issue), the most damaging evidence was permitted to be introduced against the defendant; and, though the state's attorney had contended for its admission as competent evidence, and had manifestly secured the precise replies he expected, he withdrew the evidence on his own motion.

The whole record impresses us with the conviction that the rule permitting a party to discredit his own witness under

exceptional circumstances was appealed to not, in fact, for the sole purpose of contradicting the witness, but to get before the jury, as substantive evidence, the contradictory statements of the witness. There is in all cases some danger that the jury may apply the discrediting testimony to the issue involved, instead of confining it to the mere question of the credibility of the witness; but this is an unavoidable danger, and can only be guarded against by proper instructions. As between such danger and the injustice of permitting a party to be sacrificed by the wiles of an unscrupulous witness, the law chooses the lesser evil. But it is not to be tolerated that a litigant who does not show himself in danger of injury, shall invoke the rule for the purpose of putting his adversary at a disadvantage. Why did the state's attorney insist upon the competency of the evidence until it was admitted and heard by the jury, and instantly consent that it might be excluded? No one can read the record, and doubt that the purpose was to prejudice the defendant by adding to the testimony of Mrs. Adair and Luther Adair in reference to the identification of the defendant as one of the crowd who committed the murder, the conduct and declarations of the state's witness, Cox.

Nor can we affirm that no injury was done the defendant by the course pursued. True, the court, after counsel for the state had consented thereto, directed the jury to disregard the evidence. But this direction did not necessarily cure the error. The question remains, did the jury disregard it? Can the court confidently affirm that no effect was produced by the incompetent testimony? In the progress of trials it often happens that incompetent evidence gets before the jury, either through the zeal of a willing witness or by inadvertence on the part of the counsel and court. Under such circumstances, when it is promptly withdrawn or excluded, and especially when, as is usual, the evidence is fragmentary and inconclusive, the correction cures the evil. But when, as in this case, incompetent evidence of so great import is

deliberately and forcibly introduced, the error cannot be cured by subsequently directing the jury to disregard it.

There may be cases in which the fact which the incompetent evidence tends to prove is so fully established by other evidence that the error would not cause a reversal of the judgment. But such cases rest upon a different reason, which is that the incompetent evidence adds nothing to the force of an otherwise proved fact. *Penn* v. *State*, 62 Miss., 450.

When the court cannot say with confidence that no other conclusion could have been reached by the jury upon the legal evidence in the case, the admission of incompetent and material testimony is ground for a new trial. *Taylor* v. *Adams*, 58 Mich., 187; *State* v. *Meader*, 54 Vt., 126.

　　　　　　*The judgment is reversed, and a new trial awarded.*