## THE STATE v. JOSEPH BRADLEY.

The right of resorting to force, upon the principle of self-defence, does not arise while the apprehended mischief exists in machination only, without some positive act showing the necessity of thus resorting to violence.

A cause should not be continued on account of the absence of a witness, when the facts expected to be proved by him can as well be established by other witnesses who are present.

In order to obtain a continuance, on account of the absence of a witness, it must be shown that his testimony is really material, and that the party has used due diligence to obtain the testimony, according to the rules of law and the practice of our courts of criminal jurisdiction.

The rule of court, that evidence of verbal agreements between counsel, as to the trial of a cause, will not be received, is applicable to criminal as well as to civil cases.

Letters found in one of the garments of the accused, in the room where, shortly before, a homicide had been committed, are admissible as circumstantial evidence, without proof of the handwriting of the accused.

If the jury carry with them, when retiring to consider of their verdict, a paper they should not have carried, this does not avoid their verdict; nor is it sufficient ground for a new trial, unless it appear that the jury were improperly influenced by the paper so carried with them.

If the jury, in rendering their verdict, decide the whole issue, and then add other immaterial things, the verdict is not thereby vitiated. The immaterial things so added will be regarded as surplusage.

Matters left to the discretion of the judge of the district court, resting on facts, such as motions for continuance and new trials, will not be reëxamined by the Supreme Court, in criminal cases.

APPEAL from the First District Court of New Orleans, *Mc Henry*, J. *Isaac Johnson*, Attorney General, for the State. *Randal Hunt*, for the appellant. The judgment of the court, (*Eustis*, C. J., delivering a separate opinion, in which *Rost*, J. and *Slidell*, J. concurred,) was pronounced by

PRESTON, J. The prisoner, having been indicted and brought to trial for murder, in order to obtain a continuance of the case, made and filed affidavits, that *Haynes Thompson*, *Mrs. Hart*, and *Dr. Meux* were material witnesses for him ; *Meux* and *Thompson* were temporarily absent, and *Mrs. Hart* was sick. He had not issued subpœnas for either of these witnesses, nor taken any steps to secure their attendance, or to obtain their testimony.

A trial for murder, is the most awful event that can befall a man in life. An individual whose life is put in jeopardy, upon a charge of murder, should devote his whole thoughts and energies, from the day of his arrest until his trial, to exonerate his character from imputation, and his life from jeopardy. The neglect to summon the witnesses in his behalf, and to recognize those about to absent themselves from the State, to appear on his trial, or to procure their testimony by other means, indicates that it cannot be material.

If the facts to which it is supposed these witnesses would have testified had been regarded as essential to the defence, there is no doubt proper efforts would have been made by the accused, to have procured their testimony. The affidavit states, that *Thompson* would prove that the deceased, *Fanny Young*, intended to take the life of the accused, and that she was in the habit of wearing a knife between her stocking and garter, and that *Mrs. Hart* would prove similar facts, and of equal importance to the defence. These facts, if established, would not have justified the homicide of *Fanny Young*, or even have alleviated it into manslaughter. The right of resorting to force, upon the principle of self-defence, does not arise while the apprehended mischief exists in machination only. *The People* v. *Mc Clead*, 1 Hill, 377.

The mere belief that a person has formed a design to take my life, will not alone justify me in taking his life. Without some positive act on his part, to excuse or justify killing him, it would amount to murder. 4 Iredell, 409. 1 East, 271.

Moreover, *Mrs. Hart's* testimony might, in all probability, have been obtained during the progress of the trial, if the accused had desired it ; for the court, as appears by the bill of exceptions, suggested that a subpœna should be issued for her ; of which suggestion the accused did not avail himself. It was not pretended in the affidavit, that *Dr. Meux* could prove that the deceased inflicted on the prisoner the wounds which he dressed. As to the wounds themselves, the nature of the case leaves no doubt that their existence could have been proved by other witnesses ; and a cause should not be continued to obtain the testimony of absent witnesses, as to facts which could be proved by witnesses present. The accused, in his affidavit, further states that *Dr. Meux* took all the papers out of deponent's pockets, and would show that there were no such papers as those now in court, and alleged to have been found on his person. As the papers were subsequently given in evidence on behalf of the State, there is no doubt the district court would have received the testimony of *Dr. Meux* on the subject,

if he had been present, and possibly would have continued the cause for the testimony, if proper diligence had been used, without success, to obtain it, or to procure his attendance, and if the same facts could not have been proved by other witnesses. But the rules of law which apply and should govern this case, are, that in order to obtain a continuance, it must be shown that the witness is really material, and that the party who claims the continuance has been guilty of no neglect in endeavoring to obtain the testimony of the absent witnesses, according to the rules of law and the practice of our courts of criminal jurisdiction.

Two applications for a continuance, on separate affidavits, having already been made and overruled, the court properly gave less consideration to the third, than if all the grounds had been presented at once, in a single affidavit. Besides, the testimony of *Dr. Meux* on this subject would only have been rebutting testimony, and not irreconcilable with that upon which the court admitted the papers in evidence,—that they were found in the pocket of a vest belonging to the accused, in the corner of the room which was the scene of the tragedy, and which may have been taken from the person of the accused, before *Dr. Meux* examined it.

The second ground for a continuance was of a different character. The case having been called for trial on the 18th of June, 1849, the counsel of the accused moved to continue it, on the ground that they had an understanding with the attorney general, that it would not be tried until fall. The court having overruled the motion, and directed the trial to proceed, the counsel withdrew from the case. After some progress had been made in the cause, a distinguished lawyer appeared, at first as *amicus curiæ*. and afterwards acted as the advocate of the prisoner, until the close of the trial.

The jury found the prisoner guilty of murder, without capital punishment, and recommended him to the mercy of the court, on the ground that he was not prepared for trial. They added, at the suggestion of the court, that they did not intend in any manner to censure the action of the court.

On account of these unusual occurrences, the counsel of the accused has urged, with uncommon zeal and ability, that the judgment should be reversed, and the cause remanded for a new trial.

The trial of the prisoner took place on the 18th of June, 1849. On the 14th of June, 1849, a notice, issued by the clerk, was served upon the prisoner by the sheriff, informing him that his trial would take place on the 18th of June, at ten o'clock in the morning. On the same day, he was furnished with a list of the jury empanneled to serve in the court for the June term in pursuance of law. These things clearly indicated to the prisoner, that his trial was to take place on that day.

One of the counsel of the accused believes, there was an understanding with the attorney general, that the case would not be tried until the ensuing fall. The attorney general did not think any such understanding existed. To avoid all such conflicts between counsel in causes, or the parties, the district courts of the city adopted a general rule, that "no private agreement or consent between parties or their counsel, relative to the progress of any cause, shall be alleged or suggested by either of them against the other, unless the evidence thereof shall be in writing, subscribed by the party against whom it is alleged or suggested, or by his counsel." This rule was made and adopted by all the district courts of New Orleans, in pursuance of the 5th section of the act 30th of April, 1846, and is absolutely conclusive of the question before the court. The district judge

made it the basis of his decision, on the application for a continuance on the sup- <span style="float:right">STATE<br>*v.*<br>BRADLEY.</span>
posed understanding. Were we allowed by law to disregard the rules of the
district courts, we would not think of disregarding one so salutary in promoting
certainty in practice, and in preventing disagreeable conflicts between parties to
suits, or between their counsel. The suggestion, that the rule was adopted only
for civil and not for criminal cases, is entirely unfounded. It is made, in express
terms, applicable to "any cause." There was no error, therefore, in refusing to
continue the case on the supposed understanding of counsel.

Nor was the accused deprived of his constitutional and legal right to be
defended by counsel. Having employed counsel to defend him, they, no doubt,
pursued the course which they deemed best in his case, or due to themselves.
Having retired, after failing to obtain a continuance of the case, the court offered
to assign counsel to the prisoner, which he declined to accept; and before the
trial closed, he appears to have been ably defended by a distinguished lawyer,
who took an important bill of exceptions in his behalf, and argued the case at
length to the jury.

The bill of exceptions referred to, was taken to the decision of the court,
admitting the following letters in evidence against the prisoner: "New Orleans,
March the 5th, 1849. DEAR SIR: I comit this deed, on account of trouble and
deceit. May this a warning be to all hov it may concern. My hand has been
wavering ober it for some days. My agent is *Mr. Meeker.* I wish he would
dispach the schooner Friendship, as quick as possuble, on a count of the—JOSEPH
BRADLEY."—"New Orleans, March the 5th, 1849. MR. BIDWELL. Dear
Sir: This is what I never expect to come to. But it is trouble, and no one to
help mee out. So I want you to have this young woman Burried. But mee,
let me lay top of ground, for the Turkey Buzards to eat; for I have did rong.
JOSEPH BRADLEY."

These letters were not proved to be in the handwriting of *Bradley,* or signed
by him. They would not have been admitted in evidence, being in the hands
of a third person, in a civil suit, to establish an obligation against *Bradley.* Nor
would they have been admitted in evidence in this prosecution, if no connection
between them and *Bradley* had been established. But it is stated in the bill of
exceptions, that the court was satisfied, by proof, that the letters were taken
from a vest partially covered with blood, and which belonged to the prisoner;
and, further, that it was stated by witnesses, that they were found in the pocket
of the vest worn by the prisoner on the day the homicide was committed, and
in the corner of the room where it was committed.

In overruling an application for a new trial, on the ground "that the court
erred in permitting the letters to be admitted in evidence and read to the jury,"
the judge states more fully the circumstances which, in his opinion, rendered it
proper that the letters should be given in evidence to the jury.

"Proof," he says, "had been adduced, that *Bradley* lived with the deceased
in a room rented of *Virginia King,* who also lived in the same house; that the
prisoner and the deceased had been observed conversing together on the fore-
noon of the 5th of March, near the door of the room in which they staid; the
former looking as if he were worried. An hour afterwards, it was noticed that
the door of the room was closed; and, an hour after this, a moan was heard to
proceed from this room, by *Virginia King,* who was passing by the door. The
door was forced, and an entrance effected, when *Bradley* and *Fanny Young*
were found on the floor, weltering in blood, and apparently dead. On examina-
tion, it was discovered she was dead, and that the prisoner was still alive, although

very weak from loss of blood. The evidence of the coroner had been given, which showed that the deceased had died of wounds inflicted on her with a knife; and that she must have been trying to save herself, as the cuts on the hand and arm indicated that they had been raised to ward off the weapon. A knife was found on the floor, and a razor on the bureau, both bloody. After the body of the deceased had been removed, and *Bradley* was conveyed from the room, in the latter part of the same day, or on the next, as the room was being cleaned, a black silk or satin vest was found in one corner of it, which belonged to *Bradley*, and was seen upon his person when noticed in conversation with the deceased at the door of their room." The letters were found in a pocket of this vest.

The letters were allowed to go to the jury, because these circumstances rendered it probable that they belonged to *Bradley*. They were part of the tragedy, like the bloody vest and knife on the floor, and the bloody razor on the bureau. Testimony that it was his vest, and his knife, and his razor; that they were bloody, and found with him and the corpse in the very room of the homicide, was clearly admissible in the case; so, letters relating to the homicide, found in the same room, and in the pocket of the vest, raised a presumption that they were his letters.

To rebut the presumption of any connection between *Bradley* and the letters, his counsel relied upon the facts, as appears by the bill of exceptions, that the papers were found in the vest the day after the death of *Fanny Young*, as was testified to by a woman named *Kelly*; that the room had, in the meantime, been entered by many persons; and that it was not proved that they were in the vest at the time of the death of *Fanny Young*.

With such reasons for and against their effect upon the case, they constituted circumstantial evidence in a prosecution for murder, dependent upon circumstantial evidence alone. If the jury believed, from the evidence, that they belonged to *Bradley*, it was immaterial whether they were written by him or a third person; their contents would weigh against him. But, on the other hand, the jury might suppose them prepared by *Fanny Young*, who unsuccessfully attempted to kill *Bradley*, for the purpose of eluding suspicion; or that some person else had committed the deed upon both, and left the letters to delude the civil authorities from any investigation of the case. The letters were open to all these suppositions, and others; but they were, in point of fact, found at the scene of a homicide; they evidently had reference to it, and were therefore properly, even without proof of the handwriting, left to the consideration of the jury for what they were worth.

The court, as appears by the charge to the jury, used every possible precaution to guard them against any improper influence which these letters might leave upon them, by stating that, if they were not satisfied that the letters came from the accused, they ought not to weigh against him; and that they ought to give him the benefit of all their doubts; but that, if traced to his possession, they showed a guilty knowledge on his behalf. This, perhaps, was the strongest view of the evidence. The letters, whether written by *Bradley* or not, did not prove a homicide committed by him. The jury, in finding him guilty, must have been convinced of that fact by other testimony; but when so convinced, the letters, if traced to *Bradley's* possession, whether written by himself or another, tended to show express malice, which it always behooves the State, if possible, to prove in a prosecution for murder. Had a letter been found on the

person of the deceased, which stated that, being weary of life, she had deter-
mined to commit suicide, is it possible that the paper would have heen rejected
by the court, when offered in defence, because her handwriting had not been
proved? The paper would have been open to the objection, that it might have
been written by *Bradley* to exculpate himself, or by other persons to prevent
investigation by the civil authority; but without proof to that effect, the pre-
sumption being that the paper belonged to her, we think it would have been
admissible for the accused; and that papers, found under similar circumstances,
were admissible against him, guarding the jury against any improper effect upon
their minds, by stating to the jury, that, unless they believed the papers came
from and belonged to *Bradley*, they ought not to weigh against him; which
appears to have been done in this case.

The description of circumstantial evidence, adopted by Wills, from Burk's
celebrated speech against Warren Hastings, and cited by the district court,
applies to the evidence in controversy, and supports its admissibility by authority.
"All the acts of the party; all things that explain, or throw light on these acts;
all the acts of others relative to the affair, that come to his knowledge, and may
influence him; his friendships and enmities; his promises, his threats, the truth
of his discourses; the falsehood of his apologies, pretences, and explanations;
his looks, his speech, his silence where he was called to speak; every thing
which tends to establish the connection between all these particulars; every cir-
cumstance, precedent, concomitant, and subsequent, become parts of circum-
stantial evidence. These are, in their nature, infinite, and cannot be compre-
hended within any rule, or brought under any classification." Wills on Circum-
stantial Evidence, 27.

And as Lords Mansfield and Hardwicke leaned to the admissibility of a wit-
ness, leaving the objections made to his competency to go to his credit, so, we
think, the district court did right in leaning to the admissibility of the circum-
stantial evidence offered, leaving the objections to it to go to its effect, giving
such directions to the jury as the nature of the case required.

It was urged, as a ground for a new trial, that the two letters were taken by
the jury into their retirement, to deliberate on the case; and it appears by the
evidence, that they were attached to an affidavit, made before the recorder, as
to the place where they were found.

In overruling this ground for a new trial, the court observes, that the contents
of the affidavit had been stated to the jury, by the witness, on the trial. It is
admitted, that these papers were carried out by the jury without the knowledge
and consent of the court, or attorney general; and that the jury, having come
into court at the moment the judge was about sending for them on account of
these papers, was instructed by the court, that they ought not to have carried
the papers out of court; and the judge states, that he again reminded them,
that it was their duty to exclude from their consideration, in making up their
verdict, every thing but what had been submitted in evidence. It was not until
the next day that a verdict was rendered.

Lord Coke states, that "if the jury carry away any writing which was given
in evidence in open court, this shall not avoid their verdict; albeit, they should not
have carried it with them." Coke, Littleton, p. 227. The Supreme Court of
Pennsylvania, in the case of *Alexander et al.* v. *Jamison et al.*, decided the same
thing. 5 Binny's Reports, 239.

It was undoubtedly an irregularity, that the affidavit attached to the letters
should have been taken into their retirement by the jury. It was corrected as

soon as discovered, and a long time before the jury rendered their verdict. And as soon as the irregularity was discovered, the jury were told that it was their duty to exclude from their consideration, in making up a verdict, every thing but what had been submitted as evidence on the trial.

It is the duty of the courts and their officers, to guard, as far as possible, against all irregularities in their proceedings. Still, they will occur; because tribunals of justice, like all human institutions, are imperfect. Some irregularities are of so gross a character, that a prejudicial effect may be presumed. We do not think the one complained of is of that character. If, by any means, it could be shown, that the affidavit had produced an improper influence on the jury in making up their verdict, it would afford sufficient ground for granting a new trial. But we will not presume it, because it is barely possible. We should regard jurors as rational men, capable of performing the high duties which the Constitution and laws impose upon them. The Constitution and laws charge them to judge of the issues upon which life, liberty and property depend. The law presumes them to possess the capacity and integrity to perform those duties correctly, and that they will not be swerved from their performance by improper influences; and we will not presume or decide the contrary, until it appears by proof, or necessarily results from their gross misconduct.

The accused further made application for a new trial, on the ground of newly discovered testimony. He filed, in support of it, the affidavit of *Margaret Glover*, that deceased carried a knife; that she said, she carried it to cool *Bradley*, and that if the knife could not do it, arsenic would. She believed the deceased intended to kill *Bradley*, and that she warned him of it more than once. Therefore, it was not newly discovered testimony, and probably might have been obtained, under the suggestion of the court as to *Mrs. Hart*, to have her subpœnaed during the progress of the trial. But this evidence is also subject to the observations, as to its materiality, made in relation to the testimony of the other absent witnesses; it afforded a powerful motive to the accused to quit their common room, and go permanently on board his vessel, or even to bind over *Fanny Young* to keep the peace; but did not justify his killing her, or even alleviate the criminality of the act into manslaughter.

We have already stated the verdict of the jury. That part of it which was responsive to the issue, and the act of the General Assembly, approved on the 29th of May, 1846, was, that the prisoner was guilty of murder without capital punishment.

The jury added three other matters to their verdict. They recommended the prisoner to the clemency of the court. They gave, as the ground of their recommendation, that he was not prepared for trial. They declared, that they did not intend to censure the course of the court. Neither of these three things were in issue. It would have been more proper, that the expression, by the jury, of their wishes and opinions should have been written on a separate paper, and not upon the indictment, as a part of their verdict.

As it was a case in which the court could exercise no clemency, as to the punishment; as the jury had nothing to do with the preparation of the prisoner for his trial; and as their applause or censure of the court was immaterial to the case, it was proper for the court to have regarded all this, which was not responsive to the issue, as surplusage. Lord Coke lays down the rule, that "if the jury give a verdict of the whole issue, and more, &c., that which is more is surplusage, and shall not stay judgment, for *utile per inutile non vitiatur*." Coke upon Littleton, 227.

STATE<br>*v.*<br>BRADLEY.

It is urged, that the verdict was the compromise of a difference of opinion with the court. That part of the verdict which settled the true issue, could not have been a compromise. The statement, after finding the prisoner guilty, that he was unprepared for trial, strengthens the conclusion that, on the evidence before the jury, they were obliged to find him guilty. The statement, therefore, must have been intended to have an influence upon the court in a subsequent stage of the case. It could only have an effect in the consideration of an application for a new trial. There it might, and probably was, well considered by the court. For in criminal trials, besides the cases in which it is well settled that new trials may be granted, others of a novel character may occur, in which it would be proper to grant a new trial, although no precedent could be found.

We do not think the jury intended any thing offensive to the court by their verdict, in its original form; and consider the addition made to it, surplusage which in no manner vitiates it. And upon the whole, in this singular case, although the counsel of the accused adopted an unusual course; although the ury traveled out of their appropriate sphere; and although the court suggested a modification of the verdict, for which we find no precedent; yet, in the great matter, that the prisoner was guilty of murder, the jury were satisfied, by legal evidence; the court, after an anxious and elaborate examination, fully approved that part of the verdict, and we have found no error of law in the record of the trial.

It is therefore ordered, adjudged and decreed, that the judgment of the court below be affirmed, with costs.

EUSTIS, C. J. I concur in the conclusions of Judge Preston, on the questions of law presented in the bill of exceptions taken in the interest of the prisoner on the trial of the cause, and arising in the application for a new trial. Under the decision of this court, in the case of *The State* v. *Hunt*, 4th Ann. 438, and in the case of *The State* v. *Lintell*, recently decided, I do not think myself called upon to express any opinion upon the matters of fact upon which the judge exercised his discretionary power in refusing to continue the case, when called for trial ; and after the verdict, to grant the prisoner a new trial.

I concur in the affirmance of the judgment of the district court.