THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v WILLIAM OVERTON, PLAINTIFF IN ERROR.

Submitted June 30, 1913—Decided July 2, 1913.

1. It is no valid ground for a change of venue or for the adjournment of a trial for murder, that a statement had appeared in a newspaper to the effect that the prosecutor of the pleas had said the previous day in open court that he had no confidence in the jury returned to try another homicide case, and alleged to be the same "jury" (meaning the special panel) from which the trial jury was to be selected.

2, 3. Defendant being on trial for killing his wife, his arrest and conviction in bastardy proceedings instituted at her complaint, and as a result of which he married her, were competent evidence to show motive for the crime; as also his statements to the officer that arrested him in those proceedings, "that he would never marry the girl."

4. Parol testimony of statements made by defendant at and in connection with the trial of the bastardy proceeding, *held* competent.

5. It is always the right and often the duty of a trial judge to comment on the evidence and give the jury his impressions of its weight and value, and such comment is not assignable for error so long as the ultimate decision on disputed facts is plainly left to the jury.

6. It is not error to refuse to charge that since the jury, to convict, must be satisfied of defendant's guilt beyond a reasonable doubt, they are bound to acquit if they have, on all the evidence, a reasonable doubt as to whether or not he was sane. The plea of insanity is a defence, and the burden of proving it is on the accused.

7. A verdict of guilty of murder in the first degree coupled with a recommendation of defendant to the leniency of the court is a lawful verdict of murder in the first degree, and the recommendation is surplusage. The jury having been sent back with instructions to return a verdict without recommendation, and then returning a verdict of murder in the first degree, *held,* 'that this action in no way impaired the original verdict.

On error to the Essex Oyer and Terminer.

For the plaintiff in error, *Frank M. McDermit.*

For the state, *Andrew Van Blarcom,* assistant prosecutor of the pleas (*Louis Hood,* prosecutor, on the brief).

The opinion of the court was delivered by

PARKER, J.   The plaintiff in error was convicted of murder in the first degree. It appeared by the evidence that as the result of bastardy proceedings instituted on the complaint of Carrie B. Henderson, he had married the woman and after the birth of the child had killed the mother and her infant by tying them separately with a clothes line to a bed, around the body and throat, and causing death by strangulation. The defence was insanity. The entire case is sent up pursuant to section 136 of the Criminal Procedure act; and we

take up the grounds of reversal argued, in the order in which they were presented.

1. The first point made is based on reasons 1 and 2, which are as follows:

(1) That the court erred in denying the motion of counsel for plaintiff in error because the prosecutor of the pleas had made a statement in open court the day previous to the trial of this cause when one Antonio Fiore was to be tried for murder; that he, the prosecutor, asked for an adjournment of that case because he, the prosecutor, had no confidence in the jury that had been returned to try that cause, and that jury was the same jury that was returned to try the indictment found against plaintiff in error, and therefore such statement was prejudicial to the rights of the plaintiff in error.

(2) That the court erred in not allowing counsel for the defence to submit testimony to show that the prosecutor had made such statement in order to support said motion made by counsel.

This motion was made before the trial jury was drawn. An examination of the record shows that it does not support these reasons, for there was no proof, and no offer to prove, that the prosecutor had made any such statement; the offer was to show that a report of his having done so had appeared in a newspaper. In fact, it was asserted by the prosecutor without contradiction that the two special panels were different, though taken from the same general panel. The trial jury had not been drawn; and the "jury" referred to by counsel evidently was the special list served on defendant pursuant to statute from which the trial jury was to be drawn. The argument of counsel was "that such a statement published in the newspaper, reflecting upon the competence of a jury to try a cause, is such error in a murder case that it is my duty to take advantage of it." Of course, a court cannot be put in error by the mere publishing of newspaper reports. While it may be that in cases of public excitement the possible effect of newspaper articles upon the jury may justify the court in its discretion in adjourning a trial and sum-

moning another jury, it has never in this state been a ground
of challenge to a juror that he had read newspaper reports
relating to the case, so long as he declares his ability to con-
sider the case on the evidence. *Wilson* v. *State,* 31 *Vroom*
171; *Moschell* v. *State,* 24 *Id.* 498. If not, there was cer-
tainly no legal ground for requiring the court to grant a
continuance or to discharge the special panel from which the
trial jury was to be selected; and, consequently, no error in
the denial of the motion.

2. The second point is that the witness Rooney should
not have been allowed to testify in relation to the bastardy
proceedings in the First Criminal Court of Newark, of which
he was clerk, the record being the best evidence; and that
the papers offered and admitted as the record were not prop-
erly proved as such; that up to the offer of this record no ill-
feeling between defendant and the woman had been shown;
that the complainant in the bastardy proceeding was not
identified with the murdered woman; and that the criminal
court docket showed an acquittal as well as a conviction.

The identity of the dead woman was established by evidence
of the marriage in the presence of the clerk, following the
conviction, and other evidence in the case; the contradictory
statement in the docket ("defendant tried by Judge Simon
Hahn, and acquitted, convicted and order made for $2 per
week, and bond fixed at $500") is explained by the fact that
the pages of the docket were printed forms containing both
words, one to be erased according to circumstances. That
there was a conviction was plain from the entry as to the bond
and order of filiation. Assuming that the police court was a
court of record (see *Comp. Stat.,* p. 4000, *pl.* 113; *Id., p.*
3991, *pl.* 79, 78, 85), the complete record, so far as there was
any record, was produced and authenticated by the testimony
of the clerk. It consisted of the complaint, warrant, order of
filiation, bond for appearance and the docket entries. He
gave no testimony on direct examination that was not either
as a foundation for the admission of these papers in evidence,
or by way of identification of the defendant and the woman,
and with relation to the incarceration of the defendant. The

proceedings were of course offered by the state to show motive; and ill-feeling might well be inferred from the fact that the defendant to escape imprisonment for failing to furnish a bond for support, had found himself compelled to marry the woman. There was no error here.

3. The next point made is "that the court erred in allowing witness for the state, John Eckerlein, to testify over the objection of counsel for the defence to statements made by the defendant prior to the admission of the alleged crime of murder and as a matter of fact prior to the arrest and conviction on the bastardy charge because same were too remote and not being part of the *res gestæ.*" The statement testified to is that he said to Eckerlein, some seven or eight months before the murder, at the time of his arrest in the bastardy proceeding, "I will never marry the girl." Counsel maintain that evidence of statements indicating bad feeling, especially when made some time previous to the commission of the crime, was incompetent. The rule is just the other way. In *State* v. *Rosa,* 43 *Vroom* 462, evidence was received and held competent, that accused, some three weeks before the homicide, had said he had a grudge against two unnamed countrymen of his and was going to kill them. In *State* v. *Schuyler,* 46 *Id.* 487, the fact of an altercation between accused and deceased, as long as ten years before the homicide, was held admissible, the remoteness of the occurrence going solely to the weight of the evidence. Such facts go to the question of motive; and as we have already observed, the prosecution for bastardy and occurrences thereat were relevant and competent. What defendant said at the time of his arrest falls within the same class of evidence. The cases are collected in 1 *Wigm. Ev.,* § 397.

4. What has just been said applies also to the questions now complained of as allowed on cross-examination of the defendant, viz.:

"When you were arrested and she complained about you getting her in trouble, you told the police officer you would never marry her, do you remember that?"

"When she made this charge against you, that you were the father of this baby that she was going to have, you denied it in court, didn't you?"

"Before you were convicted and placed under a $500 bond, didn't you say that it wasn't your child, you were not responsible for her condition?"

It is further objected that the bastardy proceeding being *res judicata*, the state could not show by parol proof what testimony was given thereat, the record being the best evidence. We know of no such rule. Of course, there was no "record" of the testimony; and where there is even a written transcript of it, a witness may be, and witnesses constantly are, asked on cross-examination, particularly for purposes of impeachment, whether they did not testify previously in a certain way. In this case it was a party, and the state was entitled to anything that he said that would be relevant, and within the limits of fair cross-examination.

5. The next point relates to comments of the trial judge on the evidence. Three excerpts from the charge are attacked; and for a proper understanding of them, it is advisable to quote the portion of the charge in which they occur, so as to show the context, indicating the parts excepted to by brackets.

"After the commission of the crime he wrote a letter, which is in evidence; when arrested he admitted the killing, and when he reached Newark he made a written confession. All of this evidence is before you.

["The evidence, to some of which I have alluded, indicates that the prisoner not only knew the act he had done, but contemplated the consequences that might result from the accident. Note particularly the language of the letter which he wrote immediately after the deed: 'If I must die let me die.' This expression would seem to negative his present testimony to the effect that he did not then realize that he was in this world. The letter goes on: 'I am willing to go before God for this deed,' and again, 'If I must die the Lord save my poor soul.' This language would seem clearly to indicate that the accused, at the time of the commission of the act, was

capable of distinguishing between right and wrong and was conscious that the act was one which he ought not to have done. And in the written confession the words 'I hope the Lord will forgive,' he clearly indicated a realization on his part that there was some act to be forgiven which he ought not to have done.]

"The flight of the defendant after the commission of the deed is a circumstance tending to prove a consciousness of guilt.

"The motive to kill the deceased arose, the state claims, from the fact that he was forced to marry her; that the paternity of the child was in doubt in his mind; that she constantly nagged him; that on the night in question she had left her bed, got into an altercation with him, cut him with a knife and, as he says, 'Did everything she could to make his life unhappy and got up in the night and would not let him sleep.' [That he contemplated the commission of the crime is indicated by the fact that after his wife had been thrown down or pushed over by him he went to the back porch, found some clothes line, cut off a piece and returned to hang her with it.] Here, certainly, a sufficient interval of time had elapsed to enable you to say that, having determined upon the commission of the crime, he weighed such intent before carrying it into effect. After procuring the rope he placed it about the neck of his victim and attached it to the bed in such a manner that the natural consequence would be death. The intention to take life may be presumed from the use of such instrumentalities, and in such a manner as would naturally accomplish that object. A sane man must be presumed to intend the necessary, natural and probable consequences of his own acts. If, therefore, one voluntarily or willfully does an act which has a direct tendency to destroy another's life, the natural and necessary conclusion from the act is that he intended so to destroy such person's life. [These propositions in themselves furnish evidence of willful, deliberate and premeditated murder under circumstances of great atrocity.]

"You are to consider all the evidence there is in the case upon your own responsibility, and upon your own responsi-

bility declare by your verdict whether the defence has been established."

Counsel assert that "a trial judge should not intimate any opinion upon the facts." This rule does obtain in some jurisdictions, but it is not, and we think never has been, the rule in this state. On the contrary, it is always the right, and in many cases the duty, of the trial judge to express freely the impressions made on his mind by the evidence, thus giving the jury the benefit of his judicial experience, and suggesting to them points of weakness or strength that they might otherwise overlook, provided always the ultimate decision of disputed matters of fact is fairly left to them. *State* v. *Hummer,* 44 *Vroom* 714, 718; *State* v. *Schuyler,* 46 *Id.* 487, 489; *State* v. *Bertchey,* 48 *Id.* 640, 644; *State* v. *Herron, Id.* 523, 526; *State* v. *Pulley,* 53 *Id.* 579, 582.

So far as this part of the charge deals with facts as settled, *e. g.,* the manner in which death was inflicted, defendant's flight, &c., the facts were not only undisputed, but testified to by defendant himself. In other respects, it is only a legitimate comment on the evidence, and well within the rule laid down by our cases. That the ultimate determination of the facts was left to the jury is clear from the last paragraph quoted, and from other parts of the charge where the jury are distinctly instructed that they are the sole judges of the facts.

6. The next error alleged is the refusal of the trial court to charge this request:

"Since the jury to convict must be satisfied of the defendant's guilt beyond a reasonable doubt, they are bound to acquit if they have, on all the evidence, a reasonable doubt as to whether or not he was sane."

This request was properly denied. In *Graves* v. *State,* 16 *Vroom* 347, and *State* v. *Herron,* 48 *Id.* 523, already cited on a previous point, similar requests were proffered and denied, and the ruling sustained by this court. While on the whole case the defendant must be shown by the proof to be guilty beyond a reasonable doubt, the element of sanity is no part

of the state's *prima facie* case on the proof. It is presumed, and if the presumption be not attacked by defendant's evidence, it stands, and is not even submitted for consideration. If the presumption be challenged by proof, it stands until overcome by weight of evidence. A similar doctrine obtains, in regard to drunkenness, as negativing the ability to form an intent to kill. *Wilson* v. *State,* 31 *Id.* 171; *State* v. *Mangano,* 48 *Id.* 544, 549 *et seq.* The rule is different in cases where *alibi* is relied on, and for the very satisfactory reason that in such cases the bodily presence of the accused at the place in question is an essential element of guilt, and unless the proof shows he was there, he cannot be guilty. The court charged in this case as follows:

"In the first place, insanity is an affirmative defence; the burden of proof to establish the defence of insanity rests upon the accused. The law presumes that every man is sane until the contrary be proved; the law assumes that at the time of committing the act for which he is tried, he was sane; therefore, when an accused sets up a defence of insanity the burden of proving it is upon him, and he must overcome the legal presumption of sanity by a preponderance of proof and by evidence satisfactory to the jury; if he fails to establish his insanity, the presumption, or assumption of sanity, still stands."

This charge was in all respects correct.

7. The last point relates to the form of the verdict of guilty of murder in the first degree with a recommendation of defendant to the leniency of the court. Counsel claimed a mistrial, and moved to set the verdict aside; and also claimed that the form of the verdict indicated a finding of guilty in the second degree. The court ruled that the recommendation was surplusage, but recalled the jury and instructed them that they had nothing to do with the penalty, but must declare whether they found the person guilty or not guilty of murder, and if guilty, whether in the first or second degree. The jury retired, and after further deliberation, returned with a verdict of murder in the first degree, omitting the recommendation.

We concur in the view of the trial court that the verdict as originally rendered was a good verdict of guilty in the first degree, and that the recommendation should be disregarded as surplusage. It may be that the jury were unaware that the penalty for that degree was fixed by statute, and that the court had no control over the sentence; though it is unlikely that defendant's counsel in his summing up would leave them in ignorance of this. But if they did not know it, the only result would be to facilitate their determination of guilt on the facts of the case and with no reference to the punishment attached to it; a consummation devoutly to be wished. Such verdicts have frequently been upheld elsewhere. *Bish. Cr. Pro.* (4th ed.), § 1012; *People* v. *Lee,* 17 *Cal.* 76, 79; *State* v. *Stewart,* 9 *Nev.* 120; *Penn* v. *State,* 62 *Miss.* 450; *State* v. *Bradley,* 6 *La. Ann.* 554; *State* v. *O'Brien,* 22 *Id.* 27; *State* v. *Rosa,* 26 *Id.* 75; *State* v. *Newman,* 49 *W. Va.* 724.

Was this lawful verdict vitiated by the action of the court thereon? We conclude that it was not. As the court had the undoubted right to poll the jury to ascertain that it was the individual finding of each juror, it had also the right to remove any possible uncertainty by sending back the jury after calling their attention to the surplusage, so as to ascertain beyond peradventure whether guilty in the first degree was indeed their verdict; as it in fact proved to be. The action of the court in nowise prejudiced the defendant. *Coit* v. *State,* 62 *Neb.* 15; 86 *N. W. Rep.* 925.

The judgment is affirmed.

*For affirmance*—THE CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BOGERT, VREDENBURGH, CONGDON, WHITE, TERHUNE, JJ.  13.

*For reversal*—None.