(85 South. 44)

No. 23851.

**STATE v. GUNN.**

(May 3, 1920. Rehearing Denied May 31, 1920.)

*(Syllabus by the Court.)*

1. Criminal law ⚖593—Court need not delay date of trial of a defendant who has neglected to employ counsel.

A person who has killed another, under circumstances which admit of no dispute as to the fact of the killing, and who is likely to be indicted as for a crime, is expected to know that unless he elects to escape the issue by flight he will be called on to stand trial therefor, and hence that it behooves him to seek the advice of counsel; not counsel whose views in the matter of compensation he may be unable to meet, or who by reason of ill health or other engagements may be unwilling or unable to undertake his defense, but counsel whose services it is reasonably practicable for him to secure for and at the time required, with reference to the law regulating criminal prosecutions; and whilst a trial court is bound to afford a fair and sufficient opportunity for the selection and employment of such counsel it is not bound so to delay such prosecutions as to obstruct the orderly and efficient administration of criminal justice in order to meet the view of defendant who neglects his own obligations in the premises, with reference to the employment of the counsel of his choice.

2. Criminal law ⚖268—Withdrawal of plea to indictment is not matter of right.

The withdrawal of a plea to an indictment is not a matter of right with the person indicted, but is within the sound discretion of the trial judge to permit or deny.

3. Indictment and information ⚖139—Motion to quash indictment should be filed before plea thereto.

A motion to quash an indictment predicated upon the alleged disqualification of one of the witnesses to the proceedings of the jury commission is governed by the same rule as a motion to quash on account of the alleged disqualification of a grand juror, and in either case the motion should be filed before the plea to the indictment.

4. Criminal law ⚖406(7)—General expressions of evil intent admissible to show particular intent charged.

Expressions indicating a general intent to do evil may be admissible in evidence as showing the intent to do the particular evil charged as an incident of the general evil intended.

5. Homicide ⚖166(3) — Refusal to deliver defendant's pistol on demand held admissible on question of motive.

Where a pistol belonging to a defendant charged with the murder of a town marshal had come into the possession of the sheriff, evidence that a deputy sheriff had told such defendant, say 40 days prior to the killing, that the sheriff had loaned the pistol to the marshal, was properly admitted to show motive, particularly when it also appeared that the marshal had refused to deliver the pistol to such defendant on his demand.

6. Homicide ⚖158(3), 166(1)—Defendant's statement as to intended use of toy pistol held admissible to show motive and intent.

The statement to a third person by a defendant charged with murder, made on the day of the killing, with reference to a toy pistol worn as a watch charm, "I need it for my protection; my wife is satisfied when I have this along; I may shoot a man with it in a day or two, or the next 24 hours;" was properly admitted as tending to show motive and intent.

**7. Criminal law ☞854(7) — Temporary absence of juror in custody of deputy sheriff held not to require reversal of conviction.**

Though there be .a separation of the jury during a prosecution for murder, by reason of the fact that a deputy sheriff conducts one of the jurors to the toilet and is absent with him for 4 or 5 minutes, leaving the remaining 11 jurors seated in the jury box, the conviction will not be set aside by this court, where the evidence is uncontradicted and conclusive· to the effect that the deputy sheriff did not lose sight of the juror whom he took out, that the juror held no communication with any third person, that there were in the room, in the customary positions, during said period, the clerk of the court, the prosecuting officer, the defendant on trial, and his 2 attorneys, and say 125 spectators; there being some testimony to the effect that another deputy sheriff was in the courtroom during the whole or part of the time, though not in charge of the jury, and that the judge may have been there for part of the time, and that there was no communication between any third persons and the 11 jurors who were left and who remained in the box.

**8. Criminal law ☞1111(2)—Per curiam statement as to remarks of . prosecutor conclusive.**

Where a bill of exception in a criminal case shows isolated remarks by the prosecuting officer, to which objection was made, but all the testimony taken in the case is not brought up, and the statement per curiam is that the remarks were based upon the testimony, such statement is conclusive in this court, and so the ruling of the trial court will not be interfered with when the remark objected to appears, upon its face, to have been made by way of answer and not of appeal to the jury with reference to matters . dehors the record.

**9. Criminal law ☞956(13)—Where evidence does not show separation or misconduct of jury a new trial properly refused.**

Where the evidence adduced on a motion for new trial in a criminal case in support of the allegations that there was a separation and misconduct of the jury fails to establish either the separation or the misconduct, the new trial is properly refused.

Appeal from Fifth Judicial District Court, Parish of Winn; Cas Moss, Judge.

Jalone D. Gunn was convicted of murder without capital punishment, and he appeals. Verdict and sentence affirmed.

Stubbs, Theus, Grisham & Thompson, of Monroe, for appellant.

A. V. Coco, Atty. Gen., and Julius T. Long, Dist. Atty., of Winnfield (Earl E. Kidd, of Winnfield, and T. S. Walmsley, of New Orleans, of counsel), for the State.

MONROE, C. J. Defendant was indicted on November 10, 1919, for murder charged to have been committed on November 1, and was arrested on the same day. He was arraigned on November 12, and through the law firm of Blackman, Overton & Dawkins, represented by Mr. Blackman (who stated that his firm had been employed merely for the purposes of the arraignment and of an application for delay in the fixing of the ·day for the trial), he pleaded not guilty. Over the objection of Mr. Blackman, who asked that the case be set down for trial not earlier than December 8, the court, on motion of the district attorney, ordered it fixed for November 24, with the statement, however, that the matter would be further considered on November 17, and that defendant's request would then be granted if legal reasons for· the additional delay should be shown. On November 17 Blackman, Overton & Dawkins moved that the order of November 12 be vacated and that the case be fixed for December 8 (again informing the court that arrangements for their employment to defend the accused had not been completed), which motion was denied; whereupon they gave notice that they would apply to this court for a writ to compel the continuance as requested, which they did, and their application was denied. They at once advised the trial judge and the defendant of the nonsuccess of their application by telegrams which reached the addressees on November 21, and which contained also a specific notification that the senders would not be able to represent defendant upon his trial on the 24th; and

on that day they moved the court that their names as counsel for defendant be stricken from the record, and it was so ordered, over the objection of the district attorney. Within an hour thereafter Mr. Tompson, of the law firm of Stubbs, Theus, Grisham & Thompson, of Alexandria, appeared, entered the name of that firm as counsel for defendant, and moved that the case be continued until the next term of the court. The motion as made was denied, but it was sustained to the extent that the case was continued until November 26. On that day another motion for continuance was filed and denied; but, it having been found necessary to summon additional jurors, the court, when the proper time arrived (the next day being a holiday), adjourned until November 28. In the meanwhile, and before the adjournment, the motion for continuance had been followed by a motion, or request, that defendant be permitted to withdraw his plea of not guilty, "so as to file a motion to quash the indictment," which request had been denied' and the state's objection to the entertainment of a motion to quash had been sustained. The impaneling of the jury was completed on November 28, and a unanimous verdict of "guilty, without capital punishment," was returned into court on the morning of November 30.

[1] Bills of exception were reserved to the rulings of the court refusing the continuances, refusing the request that defendant be permitted to withdraw his plea in order to file a motion to quash, and declining to entertain such motion, but our examination of those bills and rulings and of the reasons assigned for the rulings satisfies us that they fail to disclose reversible error. The bills seem rather to be predicated on the theory that the constitutional right of a defendant in a criminal prosecution to be represented by the counsel of his choice is a paramount consideration, to which the rules and regulations agreeably to which such prosecutions are

brought to trial and tried should be wholly subordinated; that, if the friends of such defendant do not come forward and promptly contribute the money to complete the "arrangements" whereby the services of the counsel of his choice may be secured for the trial upon the day fixed, in accordance with the rules of the court, or if such counsel has other engagements for that day, or is incapacitated by reason of ill health, the court should postpone the trial until those obstacles to defendant's selection of his counsel are removed. As we understand the matter, however, a person who has killed another, under circumstances which admit of no dispute as to fact of the killing, and who is likely to be indicted as for a crime, is expected to know that unless he elects to escape the issue by flight he will be called to stand trial therefor, and hence that it behooves him to seek the advice of counsel; not counsel whose views in the matter of compensation he may be unable to meet, or who by reason of other engagements or ill health may be unwilling or unable to undertake his defense, but counsel whose services it is reasonably practicable for him to secure for and at the time required, with reference to the law regulating criminal prosecutions; and whilst a trial court is bound to afford fair and sufficient opportunity for the selection and employment of such counsel it is not bound so to delay a prosecution as to obstruct the orderly and efficient administration of criminal justice, in order to meet the views of a defendant who neglects his own obligations with reference to the selection of the counsel of his choice.

In the instant case defendant knew on November 1, that he was likely to be called on to stand trial for the homicide committed on that day, and he or his friends had employed counsel prior to his arraignment on November 12, for the purposes of the arraignment and the plea which he then entered.

But they knew then that, without a definite and satisfactory arrangement as to their compensation, the counsel so employed would go no farther than to attend and advise as to that matter and to attempt to obtain delay in the fixing of the trial, and it is fairly evident that the trial judge then consented to hear the application for delay again on November 17, in order to give defendant and his friends an opportunity to complete such arrangement. And yet neither during the period between November 12 and November 17, nor afterwards up to November 24, had they succeeded in so doing. In fact, prior to the 24th they had abandoned the attempt and had employed other counsel. It is said in the motion of the 24th that, though defendant had received the telegram from Blackman, Overton & Dawkins on the 21st, his father, who was attending to the employment of counsel, was absent from home and that defendant was unable to communicate with him; and hence that the father took no steps in the matter until the 23d, when he went to Monroe to employ Mr. Theus. It does not appear, however, that the father had concealed himself, or that his whereabouts were unknown, or that defendant, who was in the community in which he lived and was surrounded by friends and relatives, could find no one to carry or send a message to his father. Moreover, his father, we think, should have been able to determine on the 17th, or before that, whether there was any reasonable prospect of his being able to make the arrangement required by Blackman, Overton & Dawkins, or whether he should employ other counsel; and we are of opinion that he had no right or reason to expect that the trial would be postponed beyond the 24th, since the trial judge had given him so to understand, and this court has never in its history, so far as we know, made an order such as that which was applied for.

The statement per curiam incorporated in the ruling of November 17, upon the motion to vacate the order of November 12, reads as follows:

"Messrs. John Blackman and J. H. Overton both appeared in open court and represented accused during the trial of the motion; both informed the court that arrangements had not been completed with them by accused. When Mr. Blackman appeared on the 12th, arrangements had not been completed, and neither had they been completed when they both appeared on the 17th, to-day; court did not know arrangements would be completed if case should be reassigned for later date. There is still one week intervening between to-day and date of trial; twelve days intervening between date case was fixed for trial and date of trial. This seems time sufficient for accused to prepare for defense, without depriving him of his constitutional right. If he can secure counsel of his choice, there is no legal reason shown why he should not do so timely; and to reassign the case gives the court no assurance that Messrs. Blackman & Overton will be employed. Court has issued an order directing the sheriff to hold two witnesses, women, and it is important that the case be tried at earliest possible date. Court is ready to appoint counsel for accused when requested."

In the statement incorporated in the bill reserved to his refusal to grant the continuance as applied for on November 26, the judge says that defendant was represented by able counsel at every stage of the case; that he concluded that the delay which he granted from the 24th to the 26th was sufficient under the circumstances, since the homicide had been committed in Winnfield, the witnesses resided there, and defendant had a father and relatives residing there, who were naturally doing what they could to assist in his defense.

"It was also necessary," the statement proceeds, "that the trial be had as early as could legally be done on account of one of the eye-witnesses for the state being very feeble and infirm. As it was, when her testimony was reached the jury and court had to go to her room, where she had been confined to her bed for several days, and receive her testimony. She was not able to come into court, and the coroner advised the court it would be to the

peril of her life to bring her out of her room into court."

It is stated in the brief of the district attorney, and not controverted:

"That the only eyewitnesses against him [defendant] were two ladies, who were being held, under the order of court, as material witnesses. One of them was old and confined to her bed and her testimony was taken at her residence."

Mere statements in arguments are not, of course, to be accepted by this court for the purposes of its decisions, save in so far as they find support in the records; but a suggestion as to the considerations which may have influenced the trial judge in a matter so largely intrusted to his discretion as the granting or refusing of a continuance may at least furnish food for reflection, and especially is that true of a statement that is so far supported by that of the judge as is the statement above quoted.

Beyond what has been said, we find nothing in the record to indicate, that if all the delay that defendant sought to obtain had been granted, and he had secured from the beginning the counsel of his first choice, anything more could have been done in his behalf than is shown to have been done.

Upon the whole, in view of the abundant notice which was given defendant of the intention of the counsel originally but tentatively employed in his behalf to retire from the case unless the condition upon which they were willing to undertake the defense should be complied with, and of defendant's lack of diligence in the matter of the employment of other counsel, of the fact that four days elapsed between the employment of such other counsel and the day of trial, of the circumstances that the killing occurred in a small town in which all the witnesses were to be found, as also many of defendant's relatives and friends, and that only three (or possibly four) witnesses were called by the state, that one of them was a woman, old, feeble, and in bad health, whom the sheriff had been ordered to hold, and, finally, of the fact that we are unable to discover that defendant has in contemplation of law suffered any prejudice by reason of his having been tried as he was tried, or to discover that the trial judge in any wise abused the discretion vested in him in such matter, we conclude that there was no error in his refusal to grant a further continuance of the case, and hence that the bills reserved thereto were not well founded. State v. Murry, 136 La. 253, 66 South. 963; State v. Turner, 122 La. 372, 47 South. 685; State v. Chitman, 117 La. 950, 42 South. 437; State v. Douglas, 116 La. 528, 40 South. 860; State v. Washington, 37 La. Ann. 829; State v. Johnson, 36 La. Ann. 852; State v. Wilson, 33 La. Ann. 261.

[2] 2. It has been said by this court with reference to a motion to withdraw a plea of not guilty:

"It was not a legal right that the accused demanded, but it was a matter that rested largely within the discretion of the trial judge. So much so that it is laid down by elementary writers on criminal law that the judge's ruling on such a motion is not reviewable by an appellate court. Bishop's Crim. Pro. vol. 1, § 782. See, also, Wharton's Cr. P. & P. § 407b." State v. Delahoussaye, 37 La. Ann. 551; State v. Williams, 45 La. Ann. 1356, 14 South. 32; State v. Jammerson, 49 La. Ann. 597, 21 South. 728; State v. Boutte, 119 La. 134, 43 South. 983; State v. Boudreaux, 137 La. Ann. 227, 68 South. 422; Bishop's New Cr. Pr. vol. 2, §§ 882(4), 884(2); 16 C. J. 396.

We are of opinion that the discretion of the trial judge was properly exercised in this instance.

[3] 3. The motion to quash was predicated upon the alleged disqualification of a witness to the proceedings of the jury commission and, as in the case of a motion to quash on account of the disqualification of a grand juror, should have been filed before pleading to the indictment. State v. McGee, 36 La. Ann. 207; 6 C. J. 407.

[4] 4. Defendant excepted to the overruling of an objection to the testimony of a state witness to the effect that on the day of the killing he heard defendant say, "I feel· mean enough to kill a son of a bitch;" that the deceased was not in the crowd and that he did not communicate to him what he had heard.

The statement of the judge is that the remark was made not more than 2½ hours before the killing; that accused had pleaded self-defense; and that the evidence was admitted to prove motive and intent.

There was no error in the ruling.

"When there is a general intent to do evil, of which evil the wrong actually done may be looked upon as a probable incident, then the party having such general intent is to be regarded as having intended the particular wrong." Marr's Cr. Jur. of La. p. 67; Whar. Cr. Ev. (10th Ed.) vol. 2, pp. 1653, 1654, 1699, 1702, 1703; State v. Morgan, 129 La. 154, 55 South. 747.

Moreover, as appears from the next bill, there was evidence tending to show that defendant may have entertained a feeling of resentment toward decedent.

[5] 5. A state witness testified that the sheriff's office came into possession of a pistol which belonged to defendant and loaned it to the decedent (whom we understand to have been the town marshal), and that witness, having so informed defendant, about 40 days prior to the killing, saw him soon afterwards conversing with decedent, which was objected to as irrelevant; but the judge states that defendant subsequently told the witness that decedent would not let him have his pistol, which, we think, met the objection.

[6] 6. A state witness testified that on the day and prior to the killing he had a conversation with defendant in Winnfield, in the course of which, noticing a toy pistol worn by defendant as a watch charm, he asked defendant to give it to him, and that defendant replied, "I need it for my protection; my wife is satisfied when I have this gun along; I may shoot a man with it in a day or so, or the next 24 hours;" which was objected to as irrelevant and intended to prejudice the jury.

We agree with the trial judge that it was admissible as tending to prove motive and intent.

[7] 7. A bill was reserved to the overruling of a motion calling for the discharge of the jury and mistrial on the ground that—

One of the jurors was permitted to leave his fellows and go "to the toilet on the floor immediately beneath the one upon which the court was held, accompanied by the deputy sheriff in charge of said jury, where he remained some 4 or 5 minutes, and in the absence of said deputy sheriff with said juror the other 11 jurors were not in the custody of a deputy sheriff or other officer; that this separation was not under the eyes of the court, since the court was not in session and the judge was not on the bench nor in the courtroom; that at the time of the said separation the courtroom was crowded with spectators."

The judge, in his statement, after describing the courtroom, says:

"Court had taken a recess until 7:30 Friday evening. After the jury had been brought into the box and seated, and just about the time court should commence, Deputy Sheriff Smith took Juror Jas. D. Ferguson, who made known his desire to retire to the toilet, over the stage and down the stairs to the toilet, all of which by the testimony attached. Courtroom had a number of spectators. Accused and counsel were sitting in courtroom at the table. There is no open door outside from room leading into toilet, and the testimony shows that the juror was in the presence of the sheriff all the time they were out of the courtroom—not more than 3 or 4 minutes. The judge was not on the bench at the time, but came into courtroom a short while after the juror and deputy returned into the jury box. There is no evidence showing that the juror was permitted to get out of the presence of the deputy; neither were the 11 jurors left in position to do any act that would be prejudicial to the rights of the accused, and we did not find any cause to discharge the jury."

The evidence is uncontradicted and conclusive to the effect that the deputy who accom-

panied the juror to the toilet did not lose sight of him, and that the juror held no communication with any third person while they were out of the courtroom, and equally conclusive to the effect that during that period of 3 or 4 minutes the other 11 jurors remained in their seats in the jury box and held no communication with any third person; it being shown that defendant and his counsel, the clerk of the court, the prosecuting attorney, and from 125 to 150 spectators were present, and there being also testimony tending to show that another deputy sheriff was in the courtroom during the period, or part of the period in question, though he himself was unable to testify positively on the subject. The deputy Smith testified that the judge was on the bench when he and the juror left the courtroom, and that he left the other jurors in the custody of "the other deputies," but from his further testimony it is evident that he merely assumed that when he left the courtroom with the juror "Ferguson" the other deputies would be in charge; and one of the witnesses testified that another deputy was in the room during the whole time that Smith was absent, but upon cross-examination declined to be positive about it. There was, however, no contradiction, and no attempt at contradiction, of the testimony showing that the 11 remained in the box, and that no one communicated with them during the absence of Smith and Ferguson; so that any presumption of injury to defendant that might have arisen from the fact of the actual separation of the jury was entirely rebutted. As has been said by this court and repeated more than once:

"It is the duty of the courts and their officers to guard, as far as possible, against all irregularities in their proceedings. Still, they will occur; because tribunals of justice, like all human institutions, are imperfect. Some irregularities are of so gross a character that a prejudicial effect may be presumed. We do not think the one complained of was of that char-

147 La.—13

acter." State v. Bradley, 6 La. Ann. 560; State v. Harris, 34 La. Ann. 120; State v. Veillon, 105 La. 414, 415, 29 South. 883.

The incident ruled on by the court in the case last above cited and the evidence relating thereto were similar to those here disclosed and it was held that there was no presumption of prejudice to the accused. In State v. Craighead, 114 La. 90, 38 South. 28, in which the conviction was set aside because accepted and sworn jurors were allowed to associate with others who had not been accepted, this court, after considering its ruling in a case previously decided, said of the latter:

"The circumstances were therefore such as reasonably to have overcome the presumption of injury which might otherwise have arisen, and the case may be classified with those in which it has been held that, where it affirmatively appears that no prejudice to the accused can have resulted, the mere separation of the jury is an insufficient cause for setting aside the verdict" (citing State v. Johnson, 30 La. Ann. 921; State v. Veillon, 105 La. 411, 29 South. 883; State v. Callian, 109 La. 346, 33 South. 363).

We find no reason to doubt the soundness of the doctrine thus recognized and, considering it applicable in the instant case, hold that there was no error in the ruling of which defendant complains.

[8] 8. A bill was reserved to the overruling of defendant's objection to the following language attributed to the district attorney as used in his closing argument, to wit:

"After having committed the awfulest crime known to the whole world, he had the audacity to walk by the body of the deceased and say, 'He is dead.'"

"I submit to you that this was one of the greatest outrages that was ever committed in the civilized world."

"The family of the deceased are not the only people interested in this."

"You have no idea, gentlemen, what far-reaching effect your verdict will have on the citizens of this parish."

The statement of the judge incorporated in the bill reads:

"The remarks excepted to are not prejudicial. They were in connection with the entire argument of the district attorney. He did not give personal opinion, but made his argument by stating the proof shows these conditions complained of to exist."

As only part of the testimony and part of the argument were taken down, the statement per curiam as to the relation between them is conclusive. The district attorney says, in his brief, that as to one of the remarks the objection was made before his sentence was completed, and as to another that it was made in answer to a plea for sympathy for the defendant, and it appears upon its face to have been made by way of answer and not of appeal.

We find no reversible error in the ruling.

[9] 9. The grounds alleged by defendant for the granting of a new trial were: (1) That, the jury having been impaneled and the trial begun, a recess was taken, and they were conducted by a deputy sheriff to a hotel, where they were provided with lunch, after which, and while in the lobby of the hotel, two of the jurors were permitted to leave the others and go upstairs, unaccompanied by the deputy sheriff, and there remained out of sight of the deputy and their fellow jurymen for several minutes, and that the hotel was crowded with guests; (2) that they were permitted to spend two nights in two rooms in the hotel, six in one room and six with the deputy sheriff in the other, each of the rooms having a door opening into the hall of the hotel through which the jurors may have gone out into the hall and other parts of the hotel.

The judge found that the alleged separation was not established, and having refused the new trial a bill was reserved.

The testimony offered on behalf of defendant in support of the allegation as to the sep-aration of the jury is unconvincing. It is that of the clerk of the hotel and of the operator of a vehicle for hire; the witnesses go no further than to say that when the jury came out of the dining room after luncheon two of them started up a stairway, of which, as we understand it, there were two, leading up on either side of the place where the clerk discharged his functions to a platform some 12 feet above him, so that unless he turned his head especially for the purpose he could not have seen the men after they had started, and could not at all have seen them when they reached the platform. He says that he knew only one of the jurors (to speak to him), but knew the others by sight, as the jury had been there before, in which statement he seems to have been mistaken, as the minutes of the court show that six of the jurors had only been accepted during that morning, and hence the clerk could not have seen them before that time. The other witness testifies that from a distance of 40 feet across the lobby he counted the jurors as they came out of the dining room; that he saw two of them stop and speak to the deputy sheriff and then start up the stairs, but that he could see them only a short distance up. He admits that the deputy was in a better position to see them. He knew only two of the jurors, and they were not the jurors who started up the stairs. There were "quite a few" other guests in the lobby at the time. The deputy sheriff testifies that he watched the jurors as closely as a man could; that they did not get out of his sight; and, again, "I don't think any one of them got out of my sight;" that no juror that he remembers asked his permission to go upstairs; being asked whether he had ever had a member of the jury to walk away and start up the stairs he replied: "Well, one of them may have run up the stairs a piece and turn around and come back when he saw the rest were not coming,

but I don't remember it occurring in this case."

As to the second ground alleged in the motion, the evidence shows that the jurors were quartered on the second floor of the hotel in two, rooms which adjoined each other and were connected by a door that remained open, and that all of the inlets or outlets from and to the rooms or either of them were fastened, save one, which was guarded by the deputy sheriff.

As between the unsatisfactory testimony of the different witnesses in regard to the alleged separation of the jury, we think that of the deputy should be accorded the most weight. He was sent to the hotel in charge of the jury with rigid and specific instructions that he was to keep them from separating, and, though we think it regrettable that he should not have been able to be more positive in his testimony on that subject, we have no doubt that he was conscientious about it, and (as he says) that he watched the jurors as well as any man could.

The trouble arose rather from the conditions under which he was working, and which were attributable to the fact that the courthouse having been burned it was necessary to quarter and feed the jury in the hotel; which being the case, it occurs to us that it would have been more prudent for the sheriff to have sent two deputies, or more, instead of one, not so much, perhaps, because of any danger of intentional wrongdoing by the jurors, but in order that more positive testimony to the contrary might be available. However that may be, the testimony offered to show the separation in this instance is, as we have said, unconvincing. The witnesses have failed to satisfy us that there was any reason why they should have taxed their memories with the facts to which they have testified, or that they were in positions to know those facts, and more particularly to be able to identify, in the lobby of a hotel in which there were many guests, two persons whom they had never before seen as members of a jury concerning the impanelment of which they were in utter ignorance. We therefore conclude that the motion for new trial was properly overruled.

The verdict and sentence appealed from are therefore affirmed.